# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 17-790

**STATE OF LOUISIANA**

**VERSUS**

**JOHN DRUMMER, JR.**

**\*\*\*\*\*\*\*\*\*\***

**APPEAL FROM THE
TWELTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2015-189360
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE**

**\*\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**

**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Marc T. Amy and John E. Conery, Judges.

AFFIRMED AS AMENDED. REMANDED FOR ENTRY OF AMENDMENT TO SENTENCE AS INSTRUCTED.

Katherine M. Franks
Louisiana Appellate Project
P.O. Box 220
Madisonville, LA 70447
(225) 485-0076
Attorney for Appellant
 John Drummer, Jr.

Anthony F. Salario
Asst. District Attorney, Avoyelles Parish
P.O. Box 1200
Marksville, LA  71351
(318) 240-7123
Attorney for Appellee
 State of Louisiana

**Cooks, Judge.**

## FACTS AND PROCEDURAL HISTORY

On September 10, 2015, John Drummer, Jr. (Defendant), who was home alone with his girlfriend's children, severely beat two-year-old Marcus Deal, Jr. (Marcus, Jr.)[1]. Shortly thereafter the child became unresponsive. Defendant took the victim to the hospital where he died as a result of massive internal injuries received during the beating. Dr. Christopher Tape, M.D. (Dr. Tape), a forensic pathologist with the Louisiana Forensic Center, performed an autopsy on Marcus, Jr.'s body on September 11, 2015. Dr. Tape testified Marcus, Jr. suffered a subdural hemorrhage on the right side of the brain and bruising on the frontal part of the brain. On the left side of the head there was a ripping tear behind the ear. There were several rib fractures in both the front and back of the child's body. Some of these fractures were older, healed fractures, and others were fresh, acute fractures. There were contusions on the lower parts of the lungs. Dr. Tape testified these could only be caused by blunt force trauma. Marcus, Jr. had lacerations to his spleen and liver large enough to cause significant bleeding in the abdominal cavity. His pancreas was lacerated and his adrenal glands, located on top of the kidneys, were torn in half—something Dr. Tape testified he had never seen before. He further stated there were also "well healed" scars—meaning it took a long time for the wounds to heal—along the back of the child's head, down his back, and the backside of one arm, which would have been impossible to miss when he was being bathed. Dr. Tape concluded the cause of death was blunt force injuries to the internal organs and the head consistent with a physical assault. He opined the acute rib fractures, head injuries, and the injuries to the internal organs were zero to three days old.

---

[1] The victim's family referred to Marcus Deal, Jr., as "Poppee" throughout the trial.

On September 24, 2015, Defendant was indicted for one count of first degree murder of Marcus Deal, Jr., a juvenile under the age of twelve, a violation of La.R.S. 14:30.[2] The State filed a "Notice of Intention to Introduce Evidence of Other Crimes, Wrongs, or Acts," on May 9, 2016. A hearing was held on May 26, 2016. The trial court ruled the State's evidence admissible. On August 23, 2016, the trial court held a hearing on the State's "Motion to Determine the Admissib[i]lity of Witnesses Statements" and, after a hearing on the motion, ruled the statement would be admissible at trial. A jury trial commenced on January 10, 2017, and Defendant was found guilty of second degree murder. Defendant filed a "Motion for New Trial" on February 27, 2017.[3] Defendant's motion for a new trial was subsequently denied. Defendant was sentenced on April 27, 2017, to life imprisonment without benefit of parole, probation, or suspension of sentence and the trial judge further stated Defendant's sentence "is not subject to diminution for good behavior as being a crime of violence."

Defendant timely appealed his conviction and sentence, asserting three assignments of error: (1) the trial judge erred in allowing the hearsay statements of the victim's sister, Markala Deal (Markala), to be admitted into evidence; (2) the trial judge erred in allowing evidence of other crimes or acts to be admitted at trial and in failing to include a jury charge as to the proper use of the evidence in the final jury instructions, and (3) the trial judge erred in failing to grant a new trial.

## TRIAL TESTIMONY

Marcus Deal, Sr. (Marcus, Sr.) is the father of the victim, Marcus, Jr., four-year-old Markala, and one-year-old Miracle. He testified he lived with the

---

[2] In the indictment and in the appellate briefs, the victim's initials are used. While La.R.S. 46:1844(W) provides that initials are to be used for victims under the age of eighteen to protect their identities, this provision is not applicable in cases where the victim dies as a result of the crime. La.R.S. 46:1844(W)(1)(a).

[3] Defendant also filed a motion for new trial on February 21, 2017.

2

children's mother, Domonique Enette (Ms. Enette), for approximately five years until 2013. He did not know Defendant prior to Defendant and Ms. Enette living together. Marcus, Sr. testified that during his visitation with the children they appeared to be afraid of Defendant. The children would cry when they realized he was taking them back to their mother. He received a call on September 10, 2016, telling him Marcus, Jr. was in the hospital. When he arrived at the hospital around 7:15 p.m. Markala was outside and met him as he exited his car. Marcus, Sr. testified Markala told him Defendant hit "Poppee" in the head because he would not eat his food. He further testified he noticed bruising on Marcus, Jr.'s body a few weeks prior to the child's death. He said his mother, the child's grandmother, also noticed the bruising when she was babysitting the children and mentioned it to him. He additionally said he did not notify the police but discussed it with his parents and the children's mother. Marcus, Sr. told a police officer at the hospital what Markala told him about Defendant hitting Marcus, Jr.

Angela Simon (Ms. Simon), Defendant's aunt, testified that on September 10, 2015, she saw "Poppee" between 2:00 p.m. and 3:00 p.m. when Defendant and Ms. Enette came to her house with the children. They wanted her to babysit but she had an afternoon engagement and was not able to keep the children. She testified Ms. Enette worked at the Bailey House from six in the morning to two in the afternoon, then at Piggly Wiggly from three until nine at night. "Poppee" appeared to be fine when she saw him that afternoon. She also stated she never saw a problem between Defendant and the children. Ms. Simon further stated she never bathed "Poppee" when she babysat him and thus never saw any scars or bruising on his body.

Detective Joe Johnson (Detective Johnson) with the Bunkie Police Department was dispatched to the hospital around 6:50 p.m. He testified

Defendant told him that after Defendant finished showering, he called for Marcus, Jr. According to Defendant the child took two steps, then collapsed. Detective Johnson testified he saw bruises on the child's body after he died. At the hospital, after the detective read Defendant his *Miranda* rights, he used his cell phone to record an interview with Defendant. The detective stated that before he interviewed Defendant, Markala told him Defendant hit her brother on the head because he would not eat his food. During this interview Defendant told Detective Johnson and Dr. Lovell J. Mayeux, M.D. (Dr. Mayeux) he sat Marcus, Jr. on the sofa with a bowl of Cheetos in front of the television while he showered. He stated his shower lasted about twenty to twenty-five minutes. When he was done, he called out to "Poppee" to do something. According to Defendant, "Poppee" got off the sofa, took two steps, and collapsed. Defendant said he attempted to revive Marcus, Jr. by pouring glasses of water on him. He said "Poppee" did attempt to get up once but rolled his eyes back and thereafter did not move. He maintained he immediately took the boy to the hospital after calling 911. Defendant said he was "surprised" when the doctor told him about the broken ribs. Defendant further stated he noticed "Poppee" staring off at something a few days before. When asked about the scarring on Marcus. Jr.'s back, Defendant at first denied knowing anything about it, but then said that "Poppee" had walked into a belt that Defendant was idly swinging around. When asked why he was swinging the belt he gave a vague response and stated he did not own a belt. Defendant admitted he was the only adult caring for Marcus, Jr. that day except for a brief period around two in the afternoon when Ms. Enette was at home. According to Defendant he sat outside while the children remained in the house for a time. At this point in the interview he became defensive and, when the detective attempted to arrest him, he responded aggressively and began swearing and screaming, shouting he wanted to

talk to his people. Several voices can be heard on the taped interview yelling at him to calm down. Scuffling sounds can also be heard. Defendant can be heard screaming that he could not breathe and that he did not do anything. Detective Johnson arrested Defendant following the interview.

Approximately seven to eight hours later, Detective Johnson, along with Detective Myra Fontenot (Detective Fontenot), searched Defendant's residence. Although Defendant said he had taken a shower just before the child collapsed, Detective Johnson observed when he encountered Defendant at the hospital Defendant was wearing dirty clothes, had dirty bare feet, and he noticed the smell of body odor. The detective also stated that while at Defendant's residence he checked the shower and noted the shower was completely dry, including the inside of the shower drain. Detective Johnson further testified that during two sessions held on September 15 and November 11, 2015, at a children's advocacy center, Markala would not speak of the incident between Defendant and Marcus, Jr.

Dr. Mayeux, an expert in family and forensic medicine, testified regarding his findings as the Coroner for Avoyelles Parish. Dr. Mayeux testified he was called to the hospital at approximately 9:15 p.m., shortly after Marcus, Jr. died. He explained his job as coroner was to investigate the deaths of individuals in the parish, determine the cause and manner of death, and determine whether an autopsy was warranted. An autopsy is always conducted on any child under the age of twelve unless the child dies of a pre-diagnosed condition, such as cancer. The coroner stated the first thing he did was to examine the child's body. He noted bruising and scarring on the body and bruising on the head, along with a torn ear. He requested an x-ray of the body and a CAT scan. He noted that on the x-ray he could see dark areas in the chest and abdominal areas which he attributed to

5

bruising of the organs or blood in the chest and abdominal cavities. He too, saw rib fractures. He also observed possible bruising to the head and brain.

Marcus, Jr.'s body was then sent to Lafayette, where Dr. Tape conducted an autopsy the next day. Dr. Mayeux discussed Dr. Tape's autopsy report at length. He essentially agreed with the findings set out in Dr. Tape's autopsy report, however, he testified in his opinion the injuries that caused Marcus, Jr.'s death were inflicted up to three hours prior to Defendant taking the child to the hospital. Based on this conclusion, Dr. Mayeux surmised Defendant inflicted the injuries considering he was the only adult around Marcus, Jr. at the time.

Dr. Mayeux spoke with Defendant at the hospital as part of his investigation. He said Defendant stated at that time "Poppee" was fine until after Defendant finished showering. Defendant told him "Poppee" was sitting on a sofa, eating Cheerios, and watching television. Defendant said he got out of the shower, called out to "Poppee," who took two steps, and collapsed. Defendant told the doctor he was alone with the children all afternoon.

Ms. Enette's mother, Cynthia, and her sister, Gabby, testified they did not notice any problems between Defendant and Ms. Enette's children. Defendant's mother and sister, Anita and Kendra Drummer, testified they witnessed Ms. Enette being physical and verbally abusive to her children, including grabbing them by the ears, on many occasions.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record we find there is one error patent concerning Defendant's sentence.

The court minutes of sentencing state in pertinent part:

AS REQUIRED BY ARTICLE 890.1 OF CODE OF CRIMINAL PROCEDURE AND ARTICLE 894.1D OF THE CODE OF CRIMINAL PROCEDURE, THE COURT DESIGNATED THAT THE CRIME INVOLVED WAS A CRIME OF VIOLENCE OR ATTEMPTED CRIME OF VIOLENCE AS DEFINED OR "AS REQUIRED BY ARTICLE 890.1 OF THE CODE OF CRIMINAL PROCEDURE ENUMERATED IN R.S. 14:2"13" [sic], AND ALSO INFORMED THE DEFENDANT WHETHER, PURSUANT TO THE PROVISIONS OF R.S. 15:571.3, THE DEFENDANT'S SENTENCE WAS NOT SUBJECT TO DIMINUTION FOR GOOD BEHAVIOR . . . .

At sentencing, the court stated, "[t]he Court notes that this is a crime of violence; however[,] regardless of the designation the sentence is not subject to diminution for good behavior as being a crime of violence and is being issued without benefit of probation, parole or suspension of sentence." This appears to be a denial by the trial court of diminution for good behavior or what is commonly referred to as "good time." "'[A] trial judge lacks authority under La.R.S. 15:571.3(C) to deny a defendant eligibility for good time credits against his sentence, because that statute is "directed to the Department of Corrections exclusively."'" *State v. Fallon*, 15-1116, p. 4 (La.App. 3 Cir. 4/6/16), 189 So.3d 605, 608 n. 2 quoting *State v. Narcisse*, 97-3161, p. 1 (La. 6/26/98), 714 So.2d 698, 699). Defendant's sentence is hereby amended to delete the trial court's statements regarding diminution eligibility and the trial court is instructed to make an entry in the minutes reflecting this amendment.

**ASSIGNMENT OF ERROR NUMBER ONE**

Defendant argues the trial court erred by allowing hearsay statements made by Markala, the victim's older sister, to be admitted at trial. During the trial Marcus, Sr. testified that Markala, who was four-years-old at the time, ran up to him when she saw him at the hospital and told him Defendant hit "Poppee" on the head because he would not eat his cereal. She also made the same statement to her

7

grandfather and, at the urging of her grandfather, told a police officer at the hospital Defendant hit the victim. Markala did not testify at trial.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 801(C). The issue of Markala's statements was raised at the August 23, 2016, hearing on State's "Motion to Determine the Admissib[i]lity of Witnesses Statements." The trial court ruled the statements made to Markala's father and grandfather were admissible at trial as an excited utterance, an exception to the hearsay rule. Louisiana Code of Evidence Article 803(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The trial court further found that the statement made to the police officer was also not hearsay but "*res gestae*" and, thus, was admissible at trial.

Defendant sought this court's review of the trial court's ruling. This court ruled the trial court did not abuse its discretion when it permitted the witness's out-of-court statements. *State v. Drummer*, 16-776 (La.App. 3 Cir. 11/3/16) (unpublished opinion), *writ denied*, 16-2151 (La. 12/16/16), 211 So.3d 393. In *State v. Humphrey*, 412 So.2d 507, 523 (La.1981) (emphasis added), the supreme court explained that an appellate court is not precluded on appeal from reviewing its previous pretrial ruling on supervisory writs:

> When this court considers questions of admissibility of evidence in advance of trial by granting a pretrial application for supervisory writs (rather than deferring judgment until an appeal in the event of conviction), *the determination of admissibility does not absolutely preclude a different decision on appeal*, at which time the issues may have been more clearly framed by the evidence adduced at trial. Nevertheless, judicial efficiency demands that this court accord great

8

> deference to its pretrial decisions on admissibility, *unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result.*

*See also State v. Perry,* 12-298 (La.App. 3 Cir. 11/7/12), 101 So.3d 575, *writ denied,* 12-2657 (La. 5/24/13), 116 So.3d 659.

At the August 23, 2016, hearing, Defendant argued Markala's statements were clearly the product of reflective thought because the statements were made in the presence of relatives hours after the victim was beaten. He asserted family members at the hospital *could* have improperly influenced Markala.

In brief, Defendant argues:

> At the time of the hearing on the admissibility of M.D.'s [Markala's] statement, it was believed that John Drummer brought M.D. and her sisters to the hospital when he came with their brother. The belief was that Mr. Drummer had brought all the children to the hospital, meaning that the M.D. [sic] was in the presence of the person she said had abused her brother until the time she made the statement to Officer Fontenot. Under those conditions, the statement made could have been deemed an excited utterance. However, at the trial, it was established that the child had been picked up by her mother and had been in her presence and in the presence of Ms. Poole for the ride to the hospital, clearly when she had been asked what had happened. Under the circumstances elicited at trial, the statement cannot be considered an "excited utterance". It's [sic] admission into the evidence at trial was error.

At the August hearing, there were only three witnesses. Markala's grandfather, Raymond Enette, stated Markala was at the hospital when he arrived, but he did not know how or when she arrived at the hospital. Detective Fontenot testified she did not know how or when Markala arrived at the hospital. She stated she was originally sent to Defendant's house regarding an unresponsive child. When she was almost to the residence she was flagged down by the victim's mother. The detective said she turned around and followed the vehicle transporting the mother to the hospital. When she arrived a few minutes behind the victim's mother, she saw Markala outside the hospital. She says this was the first

9

time she saw Markala. Marcus, Sr. testified when he arrived at the hospital he was told by a nurse Defendant brought Markala and her younger sister to the hospital. He says he first saw Markala outside the hospital and she ran up to him as he was getting out of his car. He also stated Ms. Enette was already at the hospital. He further maintained that a lady sitting next to him told him Defendant first brought the victim into the hospital and then went back out to the car to get the girls.

At the trial, Markala's grandfather, Raymond Enette, testified that after he was notified about Marcus, Jr. he rushed to the hospital. He stated when he and his wife got to the hospital, Markala's mother had not yet arrived. Raymond stated that as soon as he walked into the hospital area where family members were waiting, Markala ran up to him and told him Defendant hit "Poppee" on the head.

Sarah Poole (Ms. Poole), Ms. Enette's co-worker, testified that after Ms. Enette got the news of her son being in the hospital, she drove Ms. Enette to her house to pick up Markala and her younger sister, Miracle, who were home alone. Ms. Poole testified Markala was upset and crying but made no statements to her mother during the trip to the hospital. Ms. Poole recalled meeting up with a police officer. She did not recall if Ms. Enette got out of the vehicle and talked to Detective Fontenot on the way to the hospital. After they arrived at the hospital, Ms. Poole escorted the two little girls into the hospital. Ms. Poole did not interact with any of the family and left about an hour later.

As noted above, Defendant argues that because there was testimony at trial that Markala was transported to the hospital by her mother, rather than by Defendant, her statements did not qualify as excited utterances and thus were not admissible hearsay statements for the purpose of trial. The 911 call was made at 6:50 p.m. Marcus, Jr. was admitted into the hospital at 6:59 p.m. Marcus, Sr. testified when he arrived at the hospital at approximately 7:15 p.m., Markala was

10

already at the hospital. As evidenced by the contradicting testimonies as to how Markala arrived at the hospital, there was much stress and confusion in the twenty to twenty-five minutes between Marcus, Jr. collapsing at home and Markala telling her grandfather and her father that Defendant hit Marcus, Jr. on the head because he would not eat his cereal. Defendant does not show that whoever transported Markala to the hospital had the opportunity or inclination to prompt Markala to make statements accusing Defendant of hitting Marcus, Jr. on the head.

We find Defendant fails to show the trial record more clearly framed the issue regarding Markala's statement to her father and grandfather than when it was first considered and rejected on writ of review by this court. Defendant has also failed to show that the trial court's ruling was patently erroneous or produced an unjust result.

Concerning the trial court's ruling that the statement Markala gave to the police officer was admissible as "*res gestae*," Defendant argues in brief that the term "*res gestae*" is now considered antiquated "and only describes statements made in [sic] during the course of the event at issue." Defendant argues Markala's "statement was made at least a half-hour to an hour following the event and was made in narrating what had occurred to other persons. According to the Louisiana Supreme Court's definition, the statement does not fall within the definition." The record shows Markala first made the statement within twenty-five minutes or so after her brother collapsed at home and that she first made the statement unprovoked and unsolicited by anyone. Defendant cites *State v. Scott*, 15-1762 (La. 11/30/15), 184 So.3d 2, in support of his assertion that *res gestae* is not applicable in the current case. We find the discussion in *Scott* supports the contrary:

Res gestae is first and foremost an antiquated term for several exceptions to the rule forbidding hearsay testimony. This Court has explained res gestae in that context as follows:

> Res gestae are events speaking for themselves through the instinctive and spontaneous words and acts of participants, and not the words of the participants when narrating the events. The distinguishing characteristics of these declarations are that they must be necessary incidents of the criminal act or immediate concomitants of it, and that they are not due to calculated policy or deliberate design. *There are no limits of time within which the res gestae can be arbitrarily confined*. They vary in fact with each particular case.

*State v. Williams,* 158 La. 1011, 1013, 105 So. 46, 47 (1925) (collecting cases). The term res gestae as it pertains to hearsay no longer appears in the rules of evidence but the notion lives on in Article 801(D)(4) (defining "Things said or done" as non-hearsay) and the first three parts of Article 803 (providing hearsay exceptions for present sense impressions, excited utterances, and then existing mental, emotional, or physical conditions). In a related but distinct usage, res gestae was also used to describe "criminal acts which are an inseparable part of the whole deed" which are admissible despite the "general prohibition against the use of other crimes evidence." *See State v. Haarala,* 398 So.2d 1093, 1097 (La.1981). Former La.R.S. 15:447 (repealed by 1988 La. Acts 515) defined this type of res gestae and provided it is always admissible:

> Res gestae are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events. What forms any part of the res gestae is always admissible in evidence.

Former La.R.S. 15:448 (repealed by 1988 La. Acts 515) further provided:

> To constitute res gestae the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.

. . . .

More correctly described as *the integral act doctrine* under present law, this doctrine "reflects the fact that making a case with

12

testimony and tangible things not only satisfies the formal definition of an offense, but tells a colorful story with descriptive richness." *Old Chief v. United States,* 519 U.S. 172, 187, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997). The test of integral act evidence is therefore not simply whether the state might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, "with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." *Id.*

*Scott*, 184 So.3d at 4–5. (footnotes omitted) (emphasis added)

The trial court ruled that the statement Markala made to Detective Fontenot at the urging of her grandfather was *"res gestae"* or an "integral act," which added to the case an explanation of what happened next. Under the supreme court's rationale articulated in *Scott* we cannot say the trial court erred in admitting Detective Fontenot's testimony. This assignment of error is without merit.

**ASSIGNMENT OF ERROR NUMBER TWO**

Defendant asserts the trial court erred when it permitted other crimes evidence to be admitted at trial. Felicity Dixon, Defendant's former girlfriend and mother of his son, testified Defendant assaulted her. Defendant argues the testimony was not relevant to the crime charged and was unduly prejudicial.

In *State v. Altenberger*, 13-2518, pp. 7-8 (La. 4/11/14), 139 So.3d 510, 514-16, the supreme court discussed the consideration necessary to determine the proper use of other crimes evidence:

Most recently in *State v. Garcia*, 09-1578 (La.11/16/12), 108 So.3d 1, we addressed in detail the proper use and admissibility of other crimes evidence, explaining:

The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is, and has been, such evidence is not admissible to prove the accused committed the charged crime because he has committed other such crimes in the past or to show the probability he committed the crime in question because he is a man of criminal character. *State v. Lee,* 05-2098,

13

p. 44 (La.1/16/08), 976 So.2d 109, 139; *State v. Patza*, 3 La.Ann. 512 (1848).

Nevertheless, although evidence of other crimes, wrongs, or acts may not be admitted to prove the accused is a person of criminal character, evidence of other crimes has long been admissible if the state establishes an independent and relevant reason for its admission. *See State v. Anderson*, 45 La.Ann. 651, 654, 12 So. 737, 738 (1893). This very principle is embodied in our Code of Evidence at Article 404(B)(1), which provides, in pertinent part:

> Except as provided in Article 412 [regarding a victim's past sexual behavior in sexual assault cases], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

La.Code Evid. art. 404(B)(1). While still prohibiting the state from introducing evidence of other crimes, wrongs, or acts to show a probability the accused committed the charged crime because he is a "bad" person, the rule articulated in Article 404(B)(1) allows admission for other purposes, *i.e.*, to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La.Code Evid. art. 404(B)(1); *Lee*, 05-2098 at p. 44, 976 So.2d at 139; *State v. Kennedy*, 00-1554, p. 5 (La.4/3/01), 803 So.2d 916, 920.

*Garcia,* 09-1578 at pp. 53-54, 108 So.3d at 38.

Logically, this evidence must have substantial relevance independent from showing defendant's general criminal character in

that it tends to prove a material fact genuinely at issue. *State v. Lee,* 05-2098, p. 44 (La.1/16/08), 976 So.2d 109, 139; State *v. Moore,* 440 So.2d 134, 137 (La.1983). The trial court in its gatekeeping function determines the independent relevancy of such evidence and balances its probative value against its prejudicial effect. La.Code Evid. art. 403; *Huddleston v. United States,* 485 U.S. 681, 690-91, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988). "In this analysis, the court seeks to answer the question: Is this evidence so related to the crime on trial or a material issue or defense therein that, if admitted, its relevancy will outweigh the prejudicial effect, which the defendant will necessarily be burdened with?" *Garcia*, 09-1578 at p. 55, 108 So.3d at 39. Its answer to this question and corresponding ruling on the admissibility of the additional other crimes evidence will not be disturbed absent an abuse of discretion, *State v. Scales*, 93-2003, pp. 4-5 (La.5/22/95), 655 So.2d 1326, 1330-31, *cert. denied*, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996).

At the hearing held on May 26, 2016, pursuant to *State v. Prieur,* 277 So.2d 126 (La.1973), Ms. Dixon testified she and Defendant had a relationship for about a year.[4] They have a son together, born in August 2013. Ms. Dixon testified that before the baby was born she and Defendant broke up. When the baby was three weeks old Ms. Dixon was at a former girlfriend's house setting hair. Suddenly, Defendant barged into the house and grabbed Ms. Dixon by the neck. *Ms. Dixon stated the baby was strapped to her chest by a cloth carrier.* She said Defendant dragged her out of the house by the neck, threw her against his vehicle, and demanded to know the whereabouts of Ms. Dixon's girlfriend. Ms. Dixon testified Defendant was angry because she was at her ex-girlfriend's house, a woman with whom Ms. Dixon had a sexual relationship. Ms. Dixon testified Defendant ordered her to stay away from her former friend. When Ms. Dixon's friend came out of the house, Defendant grabbed her by the throat and slammed her against the vehicle. He then threw Ms. Dixon into the vehicle and drove away while continuing to hold her by the neck. Ms. Dixon said she was worried about the baby strapped to her chest all the while these events occurred. She testified Defendant pulled the

---

[4] The burden of proof announced in *Prieur* was abrogated by *State v. Taylor*, 16-1124 (La. 12/1/16) 217 So.3d 283. However, the burden of proof was not at issue in the current case.

15

vehicle over to "check the child" and she further testified Defendant did not directly threaten the baby. Defendant drove her to her mother's house and left her and the baby there.

Defendant was indicted on first degree murder, a violation of La.R.S. 14:30(1), which provides, in pertinent part, that first degree murder is the killing of a human being "[w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of . . . cruelty to juveniles, or second degree cruelty to juveniles."

At the pre-trial hearing, the State argued that Ms. Dixon's testimony was relevant because the crime charged involved cruelty to a juvenile and that Defendant committed cruelty to a juvenile when he grabbed Ms. Dixon and slammed her back against the vehicle with their *three-week-old son* strapped to her chest. Defendant argued that the force was directed towards Ms. Dixon and that there was no testimony he threatened or even touched the baby. He pointed out that when Ms. Dixon expressed concern for the well-being of the child he pulled the vehicle over to be sure the baby was alright.

The trial court stated:

> Under the prier [sic] notice the State filed its intention to introduce evidence of other crimes, which this incident with Ms. Dixon, no he wasn't alleged, apparently not prosecuted, but it says crimes, wrongs, or acts. The acts describe[d] by Ms. Dixon equals [sic] also a wrong to inflict any violence upon any person and certainly with the child being strapped to her and at reaching such a point a violence that Mr. Drummer himself was concerned about the physical wellbeing [of] the child, that reflects intent, motive, and certainly opportunity and the procreative value of that issue due to the child's involvement and the potential to the child is certainly admissible. Now as to the violence toward Ms. Charmaine, or whatever her name is, the alleged violence there, that's certainly is not admissible, okay and will not be allowed. The objection is noted to the ruling of the court, error is assigned for the defense.

Defendant was charged with first degree murder. The indictment read:

16

On or about 09/10/2015, in the Parish of Avoyelles, JOHN DRUMMER, Jr. committed the offense of R.S. 14:30 entitled "FIRST DEGREE MURDER" in that he did kill a human being, namely "M.D. JR.", a victim under the age of 12 years, by beating him to death, when he had the specific intent to kill or to inflict great bodily harm and while engaged in the perpetration or attempted perpetration of cruelty to juveniles or second degree cruelty to juveniles[.]

Louisiana Revised Statutes 14:93, provides in pertinent part:

A.  Cruelty to juveniles is:

(1)  The intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child.

Louisiana Revised Statutes 14:93.2.3, provides in pertinent part:

A. (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.

We find no abuse of discretion in the trial court allowing the testimony of Ms. Dixon and refusing to allow testimony regarding Defendant's attack of Ms. Dixon's girlfriend.  Defendant's actions regarding Ms. Dixon and their infant child showed a clear absence of any concern for the wellbeing of Defendant's own three-week-old infant until after his violent attack was over.  Even if we were to find the trial court abused its discretion in admitting this testimony we note that the admission of such evidence is subject to a harmless error analysis.  Such an error is harmless if the verdict is surely unattributable to the error. *State v. Garcia*, 09-1578 (La. 11/16/12), 108 So.3d 1, *cert. denied,* 570 U.S. 926, 133 S.Ct. 2863 (2013).

As noted above, testimony established Defendant was the sole adult with Marcus, Jr. on the day he was brutally beaten and died as a result of those injuries. Testimony further established that at approximately two o'clock that afternoon, Marcus, Jr. was at Defendant's aunt's house and she testified he appeared to be

17

fine at that time. By 6:50 p.m. the child collapsed as a result of a brutal beating and never recovered. Expert medical testimony established Marcus, Jr. had a subdural hematoma, bruised lungs, and lacerations on internal organs so severe that a significant amount of blood was in his abdominal cavity. Dr. Tape testified the injuries were from zero to three days old from the time the injuries were inflicted. Dr. Mayeux testified *the lacerations to his liver, spleen, pancreas, and adrenal glands were zero to three hours old* and these injuries alone would have resulted in death. Finally, there was testimony that Markala saw Defendant strike Marcus, Jr. on the head. A reversal of a jury's verdict based on an allegation of erroneous admission of prior bad acts is only required "where there is a reasonable possibility that the evidence might have contributed to the verdict." *State v. Ridgley*, 08-675, p. 16 (La.App. 5 Cir. 1/13/09), 7 So.3d 689, 699 (citations omitted), *writ denied*, 09-374 (La. 11/6/09), 21 So.3d 301. In this case, we cannot say that there is any real possibility that this evidence contributed to the verdict in light of the overwhelming evidence of Defendant's guilt.

Defendant further argues the trial court erred when it did not instruct the jury as to the limited use of Ms. Dixon's testimony as required by *Prieur,* "leaving the jury to consider it as the State intended, to show that John Drummer was a person of 'bad character' and to bolster its case[.]" At trial, Ms. Dixon's testimony was the same as the testimony she gave at the May 2016 pre-trial hearing. Prior to her trial testimony, the trial court told the jury:

> Ladies and Gentlemen of the jury, in a pretrial hearing the defense had objected to the testimony of Ms. Dixon being allowed in this case. We had a hearing to determine the admissibility of her testimony and I deemed that her testimony was admissible. The defense has objected to my ruling, the object [sic] to her testimony. However, I have allowed it, proceed.

18

"When 'other crimes' evidence is admitted in a jury trial, the court, upon the defendant's request, must charge the jury as to the limited purpose for which the evidence is to be considered." *State v. Nguyen*, 04-321, p. 15 (La.App. 5 Cir. 9/28/04), 888 So.2d 900, 909-10, *writ denied,* 05-220 (La. 4/29/05), 901 So.2d 1064. However, La.Code Crim.P. art. 801(C) provides:

> A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection. The court shall give the party an opportunity to make the objection out of the presence of the jury.

The requirements of *Prieur* notwithstanding, this Court has held that a defendant is required to make a timely objection under La.Code Crim.P. art. 801 in order to preserve a jury charge issue for review. *State v. Law,* 12-1024 (La.App. 3 Cir. 4/3/13), 110 So.3d 1271, *writ denied,* 13-978 (La. 11/22/13), 126 So.3d 475. Our review of the record establishes Defendant did not request a jury charge regarding the application and use of other crimes evidence either after Ms. Dixon's testimony, or after closing arguments but before the jury instructions were given, or after the instructions were given prior to the jury being sent to deliberate. We therefore find both aspects of this assignment of error are without merit.

**ASSIGNMENT OF ERROR NUMBER THREE**

In his third assignment of error Defendant argues the trial court should have granted his "Motion for New Trial." In *State v. Adams*, 13-992, p. 12 (La.App. 5 Cir. 5/21/14), 142 So.3d 265, 272, *writ denied*, 14-1245 (La. 2/6/15), 158 So.3d 813, the fifth circuit noted:

> Further, the ruling on a motion for a new trial is committed to the sound discretion of the trial judge and will not be disturbed on appeal absent a clear showing of abuse of that discretion. *State v. Bibbins*, 13-875 (La.App. 5 Cir. 4/9/14); *State v. Gerard*, 96-366 (La.App. 5 Cir. 11/14/96), 685 So.2d 253, 260. The merits of a motion for a new

trial must be viewed with extreme caution in the interest of preserving the finality of judgments. *Id.;* see also *State v. Rodriguez*, 02-334 (La.App. 5 Cir. 1/14/03), 839 So.2d 106, 133, *writ denied*, 03-0482 (La. 5/30/03), 845 So.2d 1061, *cert. denied,* 540 U.S. 972, 124 S.Ct. 444, 157 L.Ed.2d 321 (2003).

In his motion for new trial Defendant asserted the trial court erred when it allowed Dr. Mayeux's testimony at trial.[5] In brief, Defendant asserts:

> Dr. Mayeux significantly changed his testimony from the time of the bond hearing to the date of trial. See Supplement # 1, pp. 35-37[.] At the bond hearing, Dr. Mayeux testified that the older rib fractures could be [as] much as eight weeks old and that the new fractures could have been imposed in "less than twelve hours" and "probably less than six hours." Supplement # 1, p. 37[.] Both times were when D.E. was in the presence of the child.
>
> At the trial, Dr. Mayeux testified specifically that the injuries were inflicted within thirty minutes to three hours of the child being brought to the hospital, a time when only Mr. Drummer was taking care of the child. (R. pp. 1442-1443) Dr. Tape, the forensic pathologist who performed the actual autopsy, estimated the age of the fractures and bruising at anywhere from zero to three days. (R. pp. 1220-1222)

Defendant argues Dr. Mayeux was not qualified to give testimony regarding the injuries inflicted on the victim. Defendant offered the testimony of a forensic pathologist who testified that Dr. Mayeux was unqualified to give opinions regarding the aging of injuries as discussed in this case. Further, Defendant asserts Dr. Mayeux's testimony was biased against Defendant. In a recent case, *State v. King*, 15-1283, pp. 2-3 (La. 9/18/17), 232 So.3d 1207, 1210 (footnotes omitted) the supreme court discussed standards for an appellate court's review of a trial court's denial or grant of a motion for new trial, as follows:

> The grounds for a motion for new trial are found in Louisiana Code of Criminal Procedure Article 851, which provided at the time the defendant filed his motion:

---

[5] Doctor Mayeux testified at the *Prieur* hearing, which was held on the same day as the bond hearing, May 26, 2016.

The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.

The court, on motion of the defendant, shall grant a new trial whenever:

(1) The verdict is contrary to the law and the evidence;

(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;

(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;

(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or

(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

In addition, Louisiana Code of Criminal Procedure article 858, "Review of a ruling on motion for new trial," provides:

Neither the appellate nor supervisory jurisdiction of the supreme court may be invoked to review the granting or the refusal to grant a new trial, except for error of law.

Article 858 is a "particularized application of the constitutional limitation of the [s]upreme [c]ourt's appellate jurisdiction to questions of law only." *State v. Guillory*, 10-1231, p. 3 (La. 10/8/10), 45 So.3d 612, 614. The constitutional restrictions on the supreme court and the appellate courts in criminal cases to review only questions of law are found in La. Const. Art. V, §§ 5(C) and 10(B) (1974). La. Const. Art. V, § 5(C) provides: "In criminal matters, [the supreme court's] appellate jurisdiction extends only to questions of law." La. Const. Art. V, § 10(B) provides: "In criminal cases [a court of appeal's] appellate jurisdiction extends only to questions of law."

21

At the hearing on Defendant's motion for new trial Defendant introduced the testimony of Dr. Joye Carter (Dr. Carter), who was qualified as an expert in forensic pathology by the trial court. Dr. Carter testified at the motion for new trial that she reviewed Dr. Mayeux's resume, his *Prieur* hearing testimony, the transcript of his testimony given at trial, the transcript of Dr. Tape's trial testimony, and Dr. Tape's autopsy report. She discussed the role of a forensic pathologist in determining actual manner and causes of death and the education required to perform as a forensic pathologist with proficiency and objectivity. She informed the trial court that Dr. Mayeux, despite his long years as Coroner for Avoyelles Parish, was only a doctor of forensic medicine, which is significantly different from being a forensic pathologist. Dr. Carter agreed with defense counsel that Dr. Mayeux's testimony was "a little bit too assertive and crossed the line and got too personal by more or less usurping the opinion of Dr. Tape[.]" Dr. Carter asserted Dr. Mayeux's testimony was misleading to the jury. As an example of how and where Dr. Mayeux's testimony "cross[ed] the line," Dr. Carter noted that at the first hearing, Dr. Mayeux gave a range for the age of an unspecified bruise from one to three days. However, at trial, Dr. Mayeux changed his testimony to state the range of the age of the bruise was from zero to three hours. She stated that this specific age range for a bruise cannot be done. Interestingly, Dr. Carter approved of Dr. Tape's opinion that the "bruise" was one to three days old. It is noteworthy too, that Dr. Carter was not called as a witness at trial but was known to Defendant and could have been called as a witness.

The trial court took the matter under consideration. On April 19, 2017, the trial court denied the motion for a new trial and submitted "Reasons for Ruling on Motion for New Trial" stating in pertinent part:

The crux of the motion concerns the qualification of Dr. L.J. Mayeux. When questioned concerning his qualification, Dr. L.J. Mayeux confirmed that for more than thirty (30) years he has been Coroner of Avoyelles Parish and a Family Practitioner. Dr. L.J. Mayeux testified concerning his experience as a Coroner and his experience as a Family Practitioner. Dr. L. J. Mayeux confirmed, he has been tendered and accepted as an expert witness in many Courts in the field of Family Practice and Forensic Medicine.

Through the testimony of Dr. Carter the defense submits that there is no such specialty as "forensic medicine." Dr. Carter testified that "forensic medicine" is a term, not a specialty.

Forensic Medicine is defined in the Meriam Webster Dictionary as "a science that deals with the relation and application of medical facts to legal problems." Forensic Medicine is also referred to as "legal medicine." The American Journal of Forensic Medicine and Pathology defines Forensic Medicine as the application of medical knowledge to the investigation of crime, particularly in establishing cause of injury or death.

In the case at bar, Dr. L.J. Mayeux was tendered and accepted by the Court as an expert witness in the field of Forensic Medicine. This was based on evidence confirming that Dr. L.J. Mayeux has more than three decades of experience as a medical doctor and investigations of death as Coroner of Avoyelles Parish. During his testimony Dr. Mayeux interpreted facts based on his medical knowledge, skill, training, and experience and that is exactly what an expert witness is qualified to do. Forensic Medicine is referred to in the American Journal of Forensic Medicine and Pathology as the application of medical science to legal problems, typically involving cases concerning blood relationship, mental illness, injury, or death resulting from violence. In the case at bar, Dr. L.J. Mayeux testified to such a manner concerning a case wherein death resulted from violence, in his opinion.

Defendant alleges that the field of Forensic Medicine does not exist, however, this appears to be an incorrect assumption. Forensic Medicine has been defined above and clearly is applicable to the case at bar.

Further, the evidence submitted at the Hearing on the Motion for New Trial in the nature of the testimony by Dr. Carter specially attacks the credibility of Dr. L.J. Mayeux. Credibility of a witness is to be decided by the trier of fact, in this case the jury. Dr. Carter certainly could have been called as a witness for the defense at Trial and certainly could have testified as to her opinions concerning this case and/or her opinions concerning the testimony of Dr. L.J. Mayeux. This did not occur.

23

The defense further argues that Dr. L.J. Mayeux's testimony as to age of bruising should not have been accepted alleging that Dr. L.J. Mayeux never worked as an expert in identifying the age of a bruise. To this Court's recollection Dr. L.J. Mayeux testified that his education, training, and more than three decades of experience were sufficient for him to be in a position to give an opinion as to the age of a bruise. The time to question this opinion was at Trial, not in a Motion for New Trial. While Dr. Carter opines that it is categorically false for a doctor to simply look at a bruise and determine its age, Dr. L.J. Mayeux clearly testified that this is the manner in which he has practiced for many years. Certainly the Jury, as the trier of fact, was in a position to evaluate on the [sic] credibility of Dr. L.J. Mayeux concerning this issue and all issues so testified to by Dr. L.J. Mayeux.

The defense also alleges that the ends of justice would be served by the granting of a New Trial although acknowledging that the defendant is not entitled to a New Trial as a matter of strict legal right. This is based on the defendant's contention that Dr. L.J. Mayeux's testimony was misleading and/or prejudicial. Unfortunately for the defense, this argument belies the fact that more evidence was submitted by the State than just the testimony of Dr. L.J. Mayeux, and the Jury certainly had sufficient evidence on which upon to base their verdict. The time to attack Dr. L.J. Mayeux's testimony was at Trial, not in a Motion for New Trial.

At the hearing on Defendant's motion for new trial and in brief to this court, the State relies on *State v. Lyles*, 03-141, p. 21 (La.App. 5 Cir. 9/16/03), 858 So.2d 35, 52, for the proposition that:

[N]ewly discovered evidence affecting only a witness' credibility "ordinarily will not support a motion for a new trial, because new evidence which is 'merely cumulative or impeaching' is not, according to the often-repeated statement of the court, an adequate basis for the grant of a new trial."

Dr. Mayeux's credibility was challenged at the pre-trial hearing because he stated he could ascertain the age of a bruise. Defendant now asserts he changed his testimony at trial which he says affects the determination of Defendant's guilt. We find that Defendant's argument in support of a new trial does not present any "newly discovered evidence" under the provisions of La.Code Crim.P. art. 851, which, in pertinent part, provides:

A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to

24

have been the case the motion shall be denied, no matter upon what allegation it is grounded.

B.  The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:

. . . .

(3)  New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.

Further, as the trial court noted in denying the motion for new trial "the time to attack Dr. L.J. Mayeux's testimony was at Trial, not in a Motion for New Trial." More importantly, as pointed out by the State, the issue was the massive internal injuries inflicted on Marcus, Jr. resulting in his death, not the age of the bruising, the "well healed" scar, or when the ribs were fractured—all further evidence of physical abuse.  Additionally, we note that during cross-examination, Dr. Tape not only testified that the timeline for the infliction of the acute or fresh injuries, which included some rib fractures, was three days to zero but further stated, *"I think it's closer to the zero* but three days just to be fair." (Emphasis added)  The time frame set out by Dr. Tape and the time frame set out by Dr. Mayeux are not so disparate considering the hematoma on the brain and the lacerations to the internal organs.  At trial, both doctors testified that the bleed out from the internal lacerations was rapid and significant.  Although Dr. Carter's testimony was critical of Dr. Mayeux's opinions her criticism was based primarily on his lack of actual formal "forensic pathology" education apparently without consideration of his extensive medical education and *over thirty years of practical experience*.  A factor not lost on the trial judge or this court.

Furthermore, as noted herein in assignment of error number two, the jury had the benefit of hearing both Dr. Tape's and Dr. Mayeux's testimonies, including

25

an extensive and lengthy cross-examination by defense counsel pointing out the alleged flaws in Dr. Mayeux's opinions regarding the aging of the bruises and rib fractures.

For the reasons stated we find the trial court did not abuse its considerable discretion when it allowed Dr. Mayeux's testimony to be presented to the jury. Moreover, as discussed above in Assignment of Error Number Two, we note further that even if it was error it would be harmless given the evidence establishing Defendant's guilt was overwhelmingly sufficient for the jury to arrive at the verdict of guilty of second degree murder.

## DECREE

We affirm Defendant's conviction and sentence, however, Defendant's sentence is hereby amended to delete the trial court's statements regarding diminution eligibility and the trial court is instructed to make an entry in the minutes reflecting the amendment.

**AFFIRMED AS AMENDED. REMANDED FOR ENTRY OF AMENDMENT TO SENTENCE AS INSTRUCTED.**