STATE OF LOUISIANA

VERSUS

RANDALL PAUL BURTON

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 91186
HONORABLE C. ANTHONY EAVES, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John E. Conery, and Van H. Kyzar, Judges.

**AFFIRMED IN PART AND REMANDED.**

Conery, J., concurs in the result and assigns reasons.

Paula C. Marx
Louisiana Appellate Project
P.O. Box 82389
Lafayette, LA 70598-2389
(337) 991-9757
Attorney for Appellant, Randall Paul Burton

Asa A. Skinner, District Attorney for Vernon Parish
Terry W. Lambright, Assistant District Attorney
P.O. Box 1188
Leesville, LA 71446
Attorney for Appellee, State of Louisiana

**COOKS, Judge.**

### FACTS AND PROCEDURAL HISTORY

Randall Paul Burton (Burton) shot and killed Cody T. Fletcher (Cody) on February 1, 2017. Burton was subsequently charged with second degree murder, a violation of La.R.S. 14:30.1, and possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1. Burton was previously convicted of unauthorized entry of an inhabited dwelling and of aggravated battery. He was still on probation at the time of the shooting. A jury unanimously found Burton guilty of both offenses on April 19, 2018. He does not appeal his conviction and sentence for possession of a firearm by a convicted felon.

The trial court sentenced Burton to life imprisonment without benefit of parole, probation, or suspension of sentence for second degree murder, and to twenty years at hard labor without benefit of parole, probation, or suspension of sentence for felony possession of a firearm, to run concurrently.

Burton filed a motion for new trial on April 24, 2018, asserting the trial court erroneously sustained the State's objection which prohibited him from presenting evidence of the victim's character and reputation. He also maintained he should have been allowed to present evidence of his knowledge of the victim's bad character. The trial court denied the motion. It also denied Burton's motion for reconsideration of his sentence on May 1, 2018, without a hearing.

Burton seeks review of his conviction for second degree murder. He argues the trial court unconstitutionally deprived him of his right to present evidence supporting his plea of self-defense. He further contends the evidence was insufficient to convict him of second-degree murder and that a verdict for the lesser offense of manslaughter was appropriate.

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent regarding the trial court's statement that Burton's sentence is not subject to diminution of sentence.

After stating the number of years imposed for each of Burton's sentences, the trial court stated (emphasis added):

> Those are going to be concurrent with one another. Okay. *The sentence is not subject to diminution for good behavior, sir.* Was not enhanced upon any type of habitual offender or any commission of firearm while in the possession. You did - - you were found guilty of possessing a firearm while a convicted felon. Also, under Code of Criminal Procedure Article 914 an appeal must be written - - by written or oral motion in open court made no later than 30 days after the judgment or ruling from which the appeal is taken.

The minutes of sentencing state: "The defendant was advised that the sentence is not subject to diminution for good behavior and was not enhanced upon the basis of the habitual offender laws or other provisions of law."

Although La.Code Crim.P. art. 894.1(D) previously required the trial court to advise a defendant of whether his sentence was subject to diminution for good behavior, the article was amended in 2010 to delete that requirement. 2010 La. Acts. No. 350, § 1; *See also State v. D.G.H.*, 07-524 (La.App. 3 Cir. 10/31/07), 969 So.2d 1254. Thus, at the time the trial court imposed the present sentences, La.Code Crim.P. art. 894.1(D) no longer required such an advisement. Prior to the amendment this court distinguished between an advisement and an actual denial of diminution of sentence, finding no corrective action was needed if the trial court merely advised a defendant that his sentence was not subject to diminution. *State v. James*, 09-606, p. 3 (La.App. 3 Cir. 12/9/09), 26 So.3d 915, 917.

We find the trial court's statement is couched in terms of an actual denial of diminution of sentence. Because the trial court was no longer required by La.Code Crim.P. art. 894.1(D) to advise a defendant of whether his sentences were subject to diminution of sentence we can only conclude the trial court was not merely *advising* Burton. Additionally, contrary to what the minutes of sentencing reflect, the transcript of sentencing indicates the trial court did not specifically state that it was merely "advising" Burton regarding diminution of sentence. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62.

We therefore order the trial court to amend Burton's sentences to delete the statement regarding diminution of sentence as the trial court was not authorized to deny diminution of sentence. "'[A] trial judge lacks authority under La.R.S. 15:571.3(C) to deny a defendant eligibility for good time credits against his sentence, because that statute is "directed to the Department of Corrections exclusively."''" *State v. Fallon*, 15-1116, p. 4 (La.App. 3 Cir. 4/6/16), 189 So.3d 605, 608 n.2 (quoting *State v. Narcisse*, 97-3161, p. 1 (La. 6/26/98), 714 So.2d 698, 699). "This court and the supreme court have repeatedly stated that trial judges lack authority to deny good time eligibility." *State v. Toups*, 17-792, p. 1 (La.App. 3 Cir. 11/22/17) (unpublished opinion.)[1] The trial court is instructed to make an entry in the minutes reflecting the amendment. *See State v. Drummer*, 17-790 (La.App. 3 Cir. 6/6/18), 245 So.3d 93, *writ denied*, 18-1139 (La. 2/11/19), 263 So.3d 413.

---

[1]This case is cited at 2017 WL 5627774.

***Sufficiency of evidence.***

Burton asserts the evidence was insufficient to convict him of second-degree murder. He contends he was afraid, provoked and that he shot the victim in the heat of blood thus making him guilty of the lesser offense of manslaughter, a violation of La.R.S. 14:31.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). It is the factfinder's role, in this case the jury, to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. It is not the appellate court's function to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Ryan*, 969 at 1270. (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

4

However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

"Second degree murder is the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm . . . ." La.R.S. 14:30.1(A)(1). "Manslaughter is [a] homicide which would be [first or second degree murder], but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31(A)(1). A defendant must prove the mitigating factors of "sudden passion" and "heat of blood" by a preponderance of the evidence. *State v. Watson*, 15-392 (La.App. 3 Cir. 10/7/15), 175 So.3d 1192, *writ denied,* 15-2046 (La. 11/7/16), 208 So.3d 897.

In reviewing an accused's claim that he has met his burden of proof, an appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors had not been established by a preponderance of the evidence.

*Id.* at 1196 (citations omitted).

5

Burton's own testimony defeats his argument for manslaughter. He testified at trial that he was angrier with Deborah Keel (Deborah), his girlfriend and mother of at least one of his children, than with Cody when he told him to leave the trailer. He also testified he did not want to fight with Cody and says he told Cody from the porch that he did not want to fight him and just asked that he "please leave." Deborah testified that after Burton shot Cody, he walked back into the trailer, sat down, and calmly said "well, I killed him." He did not attempt to offer any aid to Cody after shooting him, waiting some thirty minutes or more before calling 911 to report the shooting or ask for medical assistance. Moreover, Deborah testified Burton had threatened in the past to kill any man he caught her involved with.

A number of witnesses testified at trial. Testimony of multiple witnesses established that Burton and Deborah lived together in her trailer house on Joslin Pitt Road for nine months prior to the time of this incident. She was pregnant with what Burton believed to be his child at the time. On January 31, 2017, Deborah and Burton went "down to the creek" on her father's four-wheeler to discuss "some relationship issues[.]" They took her father's 20-gauge shotgun with them. When they rode the four-wheeler back to the trailer, they noticed the lights on it were "shorting in and out[.]"Burton took the shotgun inside and Deborah went to her father's house to return the four-wheeler and get their car. Because the car had a dead battery Deborah rode the four-wheeler back to her home in the dark, still having trouble with the lights.

William Robert "Billy Bob" Freeman (Billy Bob) and another man, John Wesley Jeane (John), were at Deborah's trailer when she arrived. They went outside with Burton to look at Billy Bob's motorcycle, and then John left. Because Deborah did not like Billy Bob, she took the four-wheeler to the home of her friend, Mary Cauley (Mary), who had some pizza ready for her around 9:30 to 10:00. On the way

there the lights on the four-wheeler went out, and Deborah "was driving with a flashlight." Thirty to forty minutes after Deborah arrived at Mary's Cody arrived. He was friends with Mary's husband and a longtime friend of Burton and Deborah. About an hour to an hour and a half later, Deborah was ready to leave. Mary asked Cody to take Deborah home because the lights on the four-wheeler were out, and she felt Deborah would be unsafe riding it. Deborah and Cody left for Deborah's trailer with the pizza Mary prepared.

Although Deborah acknowledged she and Cody were longtime friends, she asserted they had never dated or had a sexual relationship. She also testified Cody spent the night at her trailer four or five times in the days before February 1, 2017, sleeping on the couch in the living room while she slept in her bedroom with Burton. According to Deborah, Cody did not know she was in a relationship with Burton. Burton, however, testified he and Cody worked together at a tree farm and sometimes rode to work together and hung out with other friends.

No one was at home when Deborah and Cody arrived at the trailer. Deborah cooked the pizza for her and Cody. Deborah testified at trial:

> [Cody] had gotten up to leave and right when he went to open the door the door swung open and [Burton] looked at me and had asked me where the f[--]k I had been and Cody said, he said, look, man, this isn't what it looks like. And, he said, you leave, and he looked back at me and went to asking me again where I'd been. And, [the victim], again, said, look, man, this ain't [sic] what it looks like and he said, I told you you need to leave and he said, you want me to leave, all right. And, he opened the door and kind of dipped out the door, and [Burton] slammed the door behind him.

According to Deborah, Burton did not ask her where she had been in a nice way, and he appeared to be angry and upset with her. She maintained Cody did not appear angry when Burton told him to leave; rather, he looked "[j]ust like his feelings were hurt." Deborah says she explained to Burton that she had been at Mary's house and asked him if Billy Bob was still at the trailer. When Burton said he was, Deborah

told him Billy Bob needed to leave. Burton responded by saying Billy Bob was "not going anywhere and then that's when he turned and grabbed the gun off the couch and opened the door and went outside," at which point Deborah said she:

> . . . heard Cody say, oh, you're going to wave [sic] a gun at me, you're going to shoot me and I heard [Burton] say, I told you I wasn't going to fight you and then I heard Cody say, shoot me, mother[--]ker, and he shot him.

According to Deborah, five to ten seconds elapsed between the time Cody went out the door, Burton grabbed the gun, and she heard the shot. She was inside the trailer, sitting on a loveseat by the front door, and she did not see how far apart the two men were. Deborah testified Burton "walked back up to the door and he sat the gun down in the doorway with his left hand and he shrugged his shoulder, 'well, I killed him.'" She described his demeanor as "[j]ust non-chalent [sic]," and she says Burton just "sat [the gun] down in the doorway."

Deborah also testified that Burton stood on the porch and told her and Billy Bob, who was standing outside, "the only way that – that I don't have to go to jail is if we do something with his body." Burton wanted Deborah to get her shower curtain "to roll him up in and then he said, he doesn't know what we could do with his truck." Billy Bob said, "man, you need to call the cops because he had a knife, it was self-defense and [Burton] said, 'oh, yeah.'" Deborah testified she never saw the victim with a knife. She described the lighting in the yard that night as "dark." All of the witnesses agreed that on the night Cody was killed it was a very dark, moonless night. In fact, when the first Deputy Sheriff walked past Cody's body lying on the ground, he did not see it because it was so dark. Cody's truck was parked about twenty-five to thirty feet from the porch but Burton claims he saw Cody in the light given off by the truck cab dome light and he maintained he saw what he thought was a knife as Cody walked toward him in the dark. DNA evidence

presented at trial showed three possible persons' DNA on the handle of the knife with the majority contributor's DNA indicating Burton as the most likely source. None of the other minor DNA contribution could be attributed to Cody, Billy Bob or Deborah.

Deborah gave multiple statements to police. She wrote a statement at the scene shortly after the shooting. She maintained in her first statement that she "was scared and in shock and [she] kind of remembered more about what happened in the other statement that [she] made." She later contacted Detective Sylvester Denmond (Denmond), Vernon Parish Sheriff's Office, on February 7, 2017, to give him additional information she remembered and felt "was necessary to the case." In that statement she said she heard Burton tell Cody he needed to leave while they were outside. At trial she did not recall saying that, but instead said she heard Burton tell Cody to leave twice when they were inside the trailer. During rebuttal, she testified she spoke with Denmond on June 7, 2017, regarding her conversations with Burton and informed him that on a number of occasions Burton: "said if he ever caught me with another man he would kill them [sic] and make me watch."

Billy Bob testified he knew Burton "[s]ince about 2012," and he had known Cody since high school for about sixteen years. Burton, Billy Bob, John, and Cody frequented a "big gathering spot" on a sandbar in the Sabine River where about fifty people would congregate, mostly on weekends. The group would "swim, fish, listen to music, drink beer, have fun." Many people in the group knew Cody and according to him Cody was well-liked among the group.

Billy Bob further testified that around 10:00 P.M., he sent a text to John informing him Deborah had not returned home and asking when he would return. Billy Bob claimed his cellphone "died soon thereafter," and he had no way to charge it. According to him, Deborah was gone "[a] couple hours." Around 10:30 or 11:00

9

P.M., Burton decided to walk to Deborah's parents' house "right up the hill just 200, 250 yards up the yard[.]" Whenever he returned he told Billy Bob the four-wheeler was not there and his keys were not in his vehicle.

According to Billy Bob, he and Burton walked up the road about a mile, following the tracks of the four-wheeler, "past where Hickman Road intersects Joslin Pitt." They saw a vehicle behind them turn from Hickman Road toward the trailer. Billy Bob says he thought it was John returning with gasoline for the motorcycle. But he and Burton soon discovered it was not John's vehicle in the driveway, it was Cody's truck. Billy Bob testified he was carrying his pistol with him in his backpack, but Burton did not have a weapon. He also testified he was aware that Burton and Deborah had experienced "relationship problems in the past," but he was "not aware of anything at that very moment."

The motorcycle was located at the end of the trailer on the back side. Billy Bob stopped at the motorcycle, and Burton walked around the trailer to the front door. Billy Bob testified:

> Once he opened the door I heard a man and a woman, both elevated voice tones, sounded as if they were arguing and I can [sic] of eased towards the end of the trailer where I could see what was going on. Naturally, I think, and I got to where I could see in the door and I seen [sic] [Cody] come out the door.

Billy Bob testified that he heard Burton tell Cody to "get the F out of my house and don't never [sic] come back ever. And he slammed the door behind [him]." The victim was carrying a "jacket or a [sic] over coat or over shirt of some sort. He walked to the hood of his truck and he looked [Billy Bob] dead in the eye and he said, Bob, I'm no cur dog, he can't make me run with my tail tucked," whereupon Cody threw his jacket on the hood of the truck.

Billy Bob described what happened next:

10

I said, Cody, man, come on, just leave the man's house, you know. And he - - he had stated he's - - he said, I'm not going to run off. He opened the truck door, fumbled around for a minute and started screaming, Paul, you're a bad man, I'm a bad man too, get your ass back out here.[2]

According to Billy Bob, who was standing "[s]even steps" away from Cody, he spoke in "an elevated voice tone, he was challenging [Burton]." He was "[y]elling at the top of his lungs." Billy Bob further testified:

> And [Cody] proceeded to scream. The last thing I heard him say was, don't make me come in there and drag you out by the hair of your head. And, at that time Mr. Burton opened the door to the trailer house and stepped out with a firearm not pointing it at anybody and not in any way, I think, threatening. He just said, boy, I done [sic] told you once to carry your ass down the road, the best thing you can do is carry your ass. And at that time [Cody] looked him in the eye and said, you're going to bring a gun out here. [Burton] said, I don't want to fight you, you just need to carry your ass. [Cody] reached in the door of his truck, grabbed something out, turned towards Mr. Burton. We're up on top of a sand hill, there was digging tracks and the man lunged forward at a rapid pace towards the corner of the porch where Mr. Burton was standing. Mr. Burton then come [sic] up with a shotgun, shot him in the chest.

Billy Bob explained how Cody made tracks in the sand when he went toward the porch at "not just a slow walk." He described the marks made in the sand as "digging tracks," and as "[k]ind of like when you leave home plate, what you leave behind you, you leave a digging track."

When asked if he knew what the victim took out of his truck, Billy Bob replied, "I did not know what he grabbed. There's one thing I'm certain of, he didn't grab the Holy Bible, go up there and witness to Paul Burton's wretched soul to save him from eternal hell fire. He grabbed something with malicious intent" and then ran toward Burton who was standing on the porch holding a shotgun. Billy Bob said Burton did not make any threats directed at Cody but only asked him to leave. But, he says, he believed Cody "was definitely in the mind set for a confrontation[,]

---

2    Defendant was known as "Paul."

11

and [Burton] did not appear to want conflict at all." According to Billy Bob, Burton came out of the trailer with the shotgun, but he never left the porch. Cody was "about six steps" away from Burton, "[a]bout three steps off the porch," when he fired the gun. Billy Bob described Cody's truck as being parked roughly fifteen to twenty yards from the porch. This is more than double the distance estimated by other witnesses. Billy Bob says he was about as physically close to Cody as Cody was to Burton, "about six steps," when Burton shot Cody. Billy Bob testified: "As soon as the confrontation started[,] I was trying to back away from the situation, but I left walking. I had walked down the road where I flagged down deputies." He says Burton told him he "was dialing 911[.]" Law enforcement officers encountered Billy Bob on Joslin Pitt Road about half to three-quarters of a mile from the scene when he flagged down officers and the ambulance to give them directions to the trailer house. He then walked back to the scene.

When Billy Bob returned to the trailer house officers asked him to write a statement and then read him his *Miranda* rights. He told Detective Denmond he could not testify about what had occurred inside the trailer and made the unsolicited remark exclaiming he had not seen anything. He later gave a recorded statement to Detective Denmond contradicting that statement telling him that he had walked from his motorcycle across the yard and told Cody "Man, just leave, man, just go." Billy Bob testified at trial he told Detective Denmond that he saw the blast from the shotgun. He denied he had ever had a conversation with Burton or Deborah about a knife.

At some point, Ann Fletcher (Ann), Cody's wife, "reached out" to Billy Bob because she "wanted to know the story of what happened to Cody that night." She testified that, "[f]rom the beginning of the story[,]" Billy Bob said he had a weapon in his boot, and Burton also had a weapon on the night of the shooting. He told Ann

they were in possession of firearms when they were walking down the road and he told her they saw a pickup truck they did not recognize when they returned to the trailer. Ann says Billy Bob told her "[t]hey thought it was some dude named Mikey and they thought he was stealing something. He also told her Burton went inside the trailer, and he "heard a lot of hollering and stuff, screaming, going on in there and he heard [Burton] tell Cody to get the f[--]k out of his house." As Billy Bob was "sitting right there by Cody's truck door," Cody "looked at Billy Bob and said, I'm not a dog, I'm not running with my tail tucked." Billy Bob told Ann that after Burton shot Cody, "he pulled his weapon up and told [Burton] to drop the fu[--]ing gun and [Burton] told him, I'm not going to shoot you and he said he put the gun down."

Burton testified in his own defense. He said he had known Billy Bob about six years, since 2012, and he had known Cody for twenty years. According to Burton, he had been wanting to leave Deborah because they "weren't getting along." The subject came up while they were down at the creek on January 31, 2017. They returned home "right at dark." No one was at the trailer when they arrived, and they were not expecting anyone. John and Billy Bob "showed up together" at the trailer house in John's vehicle about an hour after Burton and Deborah returned from the creek and were getting ready for bed. Deborah left and said she was going to her father's house to get their car.

Burton and Billy Bob stayed, working on a motorcycle. Because Deborah did not return from her father's house as expected, Burton walked to Deborah's parents' home to check on the car and found it with a dead battery. He removed the battery and returned to the trailer with plans to charge it, place it back into the car, and use the car to jumpstart the motorcycle. That plan did not work, so he and Billy Bob "started walking down the road to go follow where [Deborah] went to get the four-

wheeler." Burton said he suspected she was at the Cauleys' home three or four miles away. Deborah visited Mary almost daily.

About a mile into their walk, Burton and Billy Bob saw a truck heading toward the trailer, and they decided to go back. He thought it was probably John, or someone bringing Deborah home. Burton said Billy Bob had a gun that had been in his backpack, but he thought it was on Billy Bob's hip when they got back to the trailer. At any rate, Burton maintained he knew Billy Bob was armed throughout the events of the evening, as was his custom. When they arrived at the trailer, they recognized Cody's truck parked in the driveway. Burton had ridden to work with the victim to a tree farm where they worked together. The last time Burton went to work was on Monday, January 30; he did not go to work on January 31. Cody was also at work on January 30.

Burton explained that his work required him to cut the plastic off wrapped bundles of sheet metal. The blade kept falling out of his "box cutter knife, [his] little utility knife," so he borrowed a knife from Cody. Burton maintained he sharpened that knife along with Cody's "belt knife and his machete" on January 30 and gave all three back to Cody. He testified that one of the detectives who questioned him asked why his DNA would be on the knife, but, he said, no one ever asked him directly if he had ever handled it. He did not recall telling Detective Vance that there was no reason for his DNA to be on Cody's knife.

According to Burton's account "it had to be getting close to midnight" when he and Billy Bob returned to the trailer. They were gone at least an hour, maybe longer. He explained that he was angry with Deborah for "running off on the four wheeler way over there and leaving it . . . ." He says he was upset because he needed the four-wheeler, he "wanted to get all these people gone," and he wanted to go to bed. He too, says Billy Bob stopped by the motorcycle, and he "went on around him

and went up to the front door." Burton also said Billy Bob knew he was mad about the four-wheeler, and Billy Bob did not want to be involved in the argument between he and Deborah. Importantly, Burton says he was not angry with Cody for being present in the trailer alone with Deborah, he was only angry with her. Burton maintained Cody was "miffed at him for butting into [their] argument," and that was the reason he asked Cody to leave. He further asserted that he knew Deborah and Cody were friends and he was not jealous of their friendship. He says he did not suspect them of having a romantic affair and claimed it "[n]ever crossed [his] mind that they'd been together . . . ."

Burton denied ever telling Deborah he would kill any other man she was with and make her watch.

Burton testified:

> I asked Deborah and I may have cursed the way she said I did. I had - - my mouth was filthy back then. But I asked her where the four wheeler was - - where's the four wheeler. I didn't say, where you been or nothing. I knew where she had been by then, I saw the tracks where they went. I asked, where's the four wheeler and I may have used the F word when I said it. . .

> She said she had left it at Bruce and Mary's. She said she got cold and it's understandable, you know. But as far as all the cussing and hollering that was about as loud as it got right there and Cody butted in right then to say that she was scared because of the monkeys in our tree-line. His exact words.

Burton explained that Cody was standing four or five feet from the front door and he was mad when "[h]e stumped (sic) out the door." Cody "walked out the door, but he didn't leave." Burton did not recall if he or Cody closed the door. According to Burton's account, Deborah was getting ready for bed and asked if Billy Bob was also going to leave. Burton told her he had to help Billy Bob get the motorcycle going before he could leave and he had no way to leave because John "had never showed back up."

15

Burton testified he "heard somebody yelling outside" but he "couldn't hear what they were yelling, but [he] heard yelling and it sounded like somebody slamming doors on his truck . . . ." The yelling came from the driveway, about "30 feet probably" from the trailer. When Burton "heard all the commotion going on out there[,]" Deborah came out of the bathroom and asked if he was "going to go check on that." He "said, no, I'm not, and she said, you just going to let him steal all our stuff." Burton said he "figured it was Cody [yelling] because he was angry when he walked out," and he was "not at all" happy with being asked to leave. He asserted that he considered Cody to be a threat when he was in the yard; in fact, he "felt threatened by Cody at all times." He further testified, "Cody's a threat - - was a threat to everybody at all times."

At some point, Burton opened the door and went out onto the porch with the shotgun that had been "sitting on the couch right beside the front door." He asserted Deborah never told him to put down the shotgun. He further explained that he "realized it was Cody doing all the yelling and he's standing there with his truck door open and he's worked himself up into a - - into a fury now. He's - - I said, go home, Cody, just go home." Burton said he did not see Billy Bob because he was "focused entirely" on Cody. He did not hear Billy Bob say anything to Cody. All he could say was, "There was hollering going on. I made an assumption that it was Cody after I got outside and saw the way he was acting."

According to Burton, Cody's truck was positioned so that the driver's open door was facing the trailer. He maintains the vehicle's interior dome light was on and he could see Cody in the vehicle.

> He turned from the vehicle - - I saw what I thought was a knife in his hand and he came about half way back to me, stops, I don't know, 15, 20 feet from me and started ranting and raving.
>
> . . . .

You want to come out here, pull a gun on me, you want to shoot somebody, MF'er, shoot me, you MF'er, and that's when he took off running toward me.

Burton says he never left the porch. According to him he just asked the victim "to please leave." He admits he "may have" made statements to the victim about not wanting to fight or argue "as [Cody] was doing all his yelling and screaming. [He was] sure [he] probably did say [he] didn't want to fight him." He asserts Cody started towards him and forced him to fire the gun because he would not stop advancing. "[H]e was coming with a vengeance. There was - - there was no doubt that he was on the attack." He "couldn't believe he wasn't stopping." "[I]f I waited one more second he would have had his hand - - he would have been inside the barrel of that gun." He said he "didn't want to fire that shot," and he testified, "I did not point the weapon at him until it was absolutely necessary. I didn't even raise the weapon until it was absolutely necessary." He claims to have fired the gun from the hip and says he "didn't even have [his] finger in the trigger guard until [he] brought it up." Burton further explained that he knew Billy Bob was carrying a gun earlier, as was his habit to do, thus he "knew there was at least one armed man" in his yard, and he "had no way to know what was going on." He says he grabbed the gun on his way out knowing, of the two men outside, "one was armed and one was dangerous."

After Burton fired the shot, he says Cody "staggered backwards and he stayed on his feet for a little bit and then he - - he went down. He didn't - - he didn't fall like the doctor said, he kind of laid hisself [sic] down."[3] Burton did not move the

---

[3]Dr. Terry Welke testified he felt the victim "would have just fallen to the ground" as a result of these injuries.

body and he did not think anyone else did. As soon as he knew the victim was dead, he "went back in the house and closed the door."

Burton testified that at the time of the shooting, the moon was "probably already set[,]" and it was "very dark." He had to get a flashlight to check on the Cody: "I could see where he was, but I couldn't see any detail," but he determined "he was already gone, he was already deceased." He also said he saw the knife "[o]r something" when it flashed in the dome light of the truck. The time period from when Burton grabbed the gun and went outside was "[v]ery quick[,]" and things happened fast according to Burton. Although Cody "was already at his truck when [Burton] stepped outside," Burton asserted Cody "wasn't trying to get to this truck, sir, he was coming back at me and I let him get all the way across that ground nearly to me before I pulled the trigger." But Burton also says Cody "had already been outside before [he] heard the rufus [sic] out there and grabbed the gun to investigate." And according to Burton's own testimony, corroborated by Deborah's testimony in court, enough time had elapsed for Burton and Deborah to finish their discussion and for "her to go to the bathroom on the north end of the trailer and start getting ready and to come back as she heard it herself and asked [Burton] to go out . . . and see what's going on." Burton was unable to estimate time during that period, testifying, "Everything is jumbled up, it's just the most - - the most horrible night of my life and everything is - - it blurs together." He said he could "tell you a sequence of events probably and be right, but I am not going to be able to put a time stamp on any of it." His concept of time went "right out the window."

After Burden shot Cody, he saw Billy Bob standing off to his left. He believed Billy Bob was there at the time of the shooting because he would not have had enough time to come from the motorcycle around the trailer. Burton claims he did not know Billy Bob had left the scene until police arrived and asked where he

was. Burton went back inside and waited for police to arrive. He thought Billy Bob had called police. He asserts that twenty to thirty minutes after the shooting he realized the police should have arrived, and he also realized he could use his phone to call 911 even without any minutes remaining on it. When asked if he was in a state of shock at that point Burton responded, "Very much so, very much so and when I - - when I realized - - when I realized that Cody was deceased everything else just - - I didn't have anything in my head." After he called 911, he and Deborah sat on the couch and waited for police to arrive. Burton maintained he made the call knowing "I was going to jail, knowing that I was going away for a while." He thought he would "be going away . . . because of the felony and possession of a firearm thing."[4]

Burton asserts Deborah brought the phone to him and he made the call. He was crying during the call, choked up while he tried to talk, and admitted he shot the victim. He said he never discussed rolling the body in a shower curtain with either Billy Bob or Deborah. In fact, when asked about such a comment, he asked, "Why would I talk to [Billy Bob] about that and then call the police myself?" When the State's counsel suggested he might have been "trying to figure out what would happen with the truck," Burton responded, "That's a ridiculous notion." Burton testified it was Deborah who mentioned "not calling the cops" because she did not want him "to have to go away." When asked why he did not render any aid to Cody after shooting him Burton said he never tried to render aid to the victim because "there was . . . nothing [he] could have done."

---

[4] Burton was previously convicted of unauthorized entry of an inhabited dwelling in 2015 and of aggravated battery in 1992 when he was nineteen years old. He was forty-six at the time of trial.

Burton agreed that Cody was on the property with Deborah's permission and that she owned the trailer in which they were living. He also verified Cody stayed with them a few days before the shooting. He testified Cody would not have stayed there if he had been jealous of his relationship with Deborah. Burton admitted he spoke to Deborah from jail after the shooting and that Deborah told him about "people threatening [their] baby." He says he jokingly told her, "you tell those guys, daddy's coming home and it will be months and not years. We all know it was wrong, it was a joke."

Burton's testimony shows that although he was safely inside the trailer, he voluntarily grabbed his shotgun, went outside, confronted Cody who was some thirty feet away at his truck, pointed the gun at him from the front proch and fatally shot him. He also admitted that he was not angry with Cody but just wanted him to "please" leave. Thus, Burton's own testimony belies his assertion that manslaughter is a more appropriate charge for this killing.

When Deputy Jason Horton, shift supervisor for the Vernon Parish Sheriff's Office, arrived at the scene, he saw a mobile home with "a dim light on the porch[.]" The front door was open, and light came from inside. Deputy Horton parked his vehicle behind a pickup truck in the yard. He used a flashlight as he approached the open front door. He found Burton and Deborah "sitting on a couch just inside the front door." Neither of them was "panicky"; they "[j]ust seemed kind of relaxed[.]" He asked where the body was and they told him he had passed it in the yard. Deputy Horton found the body cold to his touch and without a pulse. Burton identified a shotgun "propped up just to the left side of the front door on the outside on the porch" as the murder weapon. Deputy Horton found blood only around the body and "an open blade pocket knife" next to Cody's hand. According to him, nothing lit the

20

area of Cody's truck other than "the dim light that was on the porch." He observed Cody's truck was more than twenty feet away from the porch.

Deputy Horton determined Cody's identity and asked Burton what happened. Burton told him Cody brought Deborah home while he was "outside helping a friend get his motorcycle running." Burton and Deborah began to argue, and Burton asked Cody to leave. Cody "got pissed off." Burton explained he "heard some hollering" and thought Cody was hollering at Billy Bob. He opened the front door and looked outside to see Cody coming back toward the mobile home with a knife in his hand. He told Cody to stop, but he would not. Burton said he was "about half-way across the front porch" when he shot Cody and about thirty minutes elapsed between the time of the shooting and when he telephoned authorities.

Deputy Cameron Smith (Deputy Smith) of the Vernon Parish Sheriff's Office also arrived at the rural, heavily wooded area and found Cody's body "laying in the yard." He had to illuminate the area with his flashlight because "[i]t was dark," and he "couldn't see without it." He testified he was the first person to see Billy Bob at the scene. Billy Bob told him "he had returned to the residence with the defendant and had saw [sic] the defendant go into the trailer house at which point he saw Cody exit the trailer house, run to the truck, throw a jacket on the hood and opened [sic] the door." Billy Bob said he planned to leave because "[h]e expected there to be an altercation and did not want to be in the area." When he heard the argument or altercation, "he was already running down the road" and as he ran, he heard a gunshot. Deputy Smith testified this conversation was recorded on his body camera.

Detective Denmond also came to the scene, which he described as "a rural area, very wooded area. It was very dark, not much light at all." He instructed the responding deputies to position their patrol units to use their lights to illuminate the scene. As Detective Denmond went to his patrol unit to retrieve his camera, Billy

21

Bob approached him and voluntarily "stated that he didn't see anything." Detective Denmond did not solicit the spontaneous statement which he found to be "out of the norm." He thought "[i]t was strange that he would make that comment."

The murder weapon was "a 20 gauge shotgun with a wooden stock and a wooden handle." Detective Denmond described the victim's gunshot wound as, "if you're standing over the body . . . the wound would be to my left to the chest area. . . ." He found a knife near the victim's body. He also found a spent 20-gauge shell in the yard and a live round on the porch. He did not know if the spent shell was involved in this case, but he was not aware of any other shells in the yard. The live round contained "low brass shot" normally used for birds. Detective Denmond estimated the distance from the victim's truck to the porch was "maybe, 25 to 30 feet, maybe." A coat, which he was told belonged to Cody, was on the truck's hood.

Detective David Vance (Detective Vance) of the Vernon Parish Sheriff's Office interviewed Burton, Deborah, and Billy Bob on February 1, 2017. Burton understood and waived his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). He admitted he shot the victim. Detective Vance said Burton "was back and forth" about the exact sequence of events. "He stated that at one time he grabbed the gun, opened the door. Another time he stated he opened the door and grabbed the gun. He said it all happened pretty much simultaneously." He told Detective Vance he did not know why he picked up the shotgun and he said that after he shot Cody, he went inside and retrieved a flashlight. He then went to check on Cody and said he did not step off the porch at any other time. During the interview with Detective Vance, Burton said he told Cody to stop, but he said, "you're not going to shoot me and laughed and . . . still kept coming forward." Burton explained that he was afraid of Cody and told Detective Vance he was about ten feet or less away from him when he fired the shot.

22

Dr. Terry Welke (Dr. Welke), qualified at trial as an expert in forensic pathology, performed the autopsy. He determined the cause of Cody's death to be "a shotgun wound to the trunk." He retrieved pellets and the power piston of the shotgun shell from inside Cody's body. Cody had several broken ribs and a torn esophagus, left lung, liver, aorta and spine. The stomach and heart were also injured. According to Dr. Welke, these fatal injuries did not necessarily produce an instantaneous death. He believed Cody may have lived for a short period of time, but he could not estimate how long. He did not think immediate medical attention could have saved Cody's life.

Dr. Welke found no gunpowder residue around the main entrance area of the wound. He testified the wound was "not a close contact shotgun wound or anything like that." Because he found no soot or gunpowder residue he opined "it was a distance away at the time of discharge." Dr. Welke, admitting he was not a firearms expert, determined the distance between the end of the shotgun barrel and Cody "was like six feet or seven feet away." The trajectory was front to back.

Cody's lab reports were positive for caffeine, cotinine (nicotine), marijuana, a synthetic opiate, amphetamine, and a level of methamphetamine Dr. Welke considered to be high. Such a level could "cause a violent type of behavior or excitation" and it could also "cause seizures at different levels[.]" He further explained that high doses of methamphetamine could "also elicit restlessness, confusion, hallucinations, circulatory collapse. What that means is they get a low blood pressure and convulsions which is [sic] essentially seizures." Dr. Welke could not say how methamphetamine would affect Cody because he did not know his social background, but he testified it could possibly have contributed to his behavior.

Dr. Jessica Esparza (Dr. Esparza) testified as the DNA technical leader and case working analyst at the North Louisiana Criminalistics Laboratory. She was

qualified as an expert in Forensic DNA analysis and biology. She described how she extracted DNA from a swab collected from the handle of a pocket-knife and from reference samples of Deborah, Burton, Billy Bob, and Cody. Dr. Esparza obtained a partial DNA profile from the knife handle that she opined "was consistent with being a mixture from at least two individuals." She found only one *major contributor* of the DNA and at least one minor contributor. Her results showed Burton could not be excluded as the major contributor, meaning the only identifiable DNA covering the knife handle was Burton's. Deborah, Billy Bob, and Cody were excluded as the major contributor. Dr. Esparza could make no conclusions about the minor contributor because of an insufficient amount of DNA. She did not swab the blade of the knife; she testified it was possible such a swab might have yielded a different result.

Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. *State v. Rubin*, 16-456 (La.App. 3 Cir. 2/1/17), 211 So.3d 532, *writ denied,* 17-406 (La. 12/15/17), 231 So.3d 641. Burton, a convicted felon on probation who was prohibited from possessing firearms, pointed the loaded shotgun at the victim and fired it. He knew the victim for many years. Although he testified he always felt threatened by Cody, he also said he worked with Cody, rode to and from work with him, and sharpened Cody's knives for him on the day before this incident. The evidence reasonably supports a finding that when Cody was outside the trailer at his truck, and Burton was safe inside the trailer, Burton had no reason to fear Cody. Moreover, the evidence shows the jury could reasonably reject Burton's theory of self-defense and could reasonably conclude that Cody was not armed with a knife when Burton shot him.

We also find there was more than sufficient evidence for the jury to reasonably conclude that Burton, by his own admission, was not angry with Cody and,

24

according to Burton's testimony, more than sufficient time elapsed for his blood to cool before he shot Cody even if he was angry with him. Manslaughter involves "sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31(A)(1). The evidence showed Burton was angry with Deborah that night and his anger was likely compounded by the problems in their relationship. Burton himself testified he was not angry with Cody even though he ordered him out of the trailer. He testified he simply did not want Cody to be involved in his argument with Deborah. The evidence shows the jury could reasonably conclude that the facts do not support a conflict between Burton and Cody that would reasonably deprive Burton of his self-control and cool reflection.

Based on the evidence presented at trial, we find the jury reasonably rejected Burton's testimony. Burton deliberately pointed a loaded gun at Cody and shot him with no reason to believe he might be armed, and with no consideration about whether lesser means might prevent Cody's progress toward him. There was more than sufficient evidence for the jury to conclude beyond a reasonable doubt that Burton was guilty of second-degree murder.

### *Self defense.*

A homicide can be justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20(A)(1).

> [W]hen an accused raises self-defense, the burden is on the State to prove, beyond a reasonable doubt, that he did not act in self-defense. "The determination of a defendant's culpability focuses on a two fold inquiry: 1) whether, from the facts presented, the defendant could have reasonably believed his life to be in imminent danger, and 2) whether deadly force was necessary to prevent the danger." *State v. Mills,* 04–489, p. 7 (La.App. 5 Cir. 3/29/05), 900 So.2d 953, 959, *writ denied,* 05–

1470 (La.1/13/06), 920 So.2d 235. "Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing and the Defendant's knowledge of the assailant's bad character." *State v. Nelson,* 34,077, p. 6 (La.App. 2 Cir. 12/6/00), 775 So.2d 579, 584.

While there is no requirement that the accused must retreat from the confrontation, the possibility of escape is a factor to be considered in determining if the accused had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Woodhead,* 03–1036 (La.App. 5 Cir. 1/27/04), 866 So.2d 995, *writ denied,* 04–598 (La.7/2/04), 877 So.2d 144.

*State v. Johnson*, 06-1263, pp. 8-9 (La.App. 3 Cir. 2/7/07), 948 So.2d 1229, 1234-35, *writs denied,* 07-467, 07-509 (La. 10/12/07), 965 So.2d 398, 399.

While it is true that the evidence showed Cody had drugs in his system that could have caused him to behave in an aggressive, violent manner, the evidence also shows Burton could not reasonably believe the victim was endangering his life. Burton was safe and secure inside Deborah's trailer when he chose to confront Cody outside. Moreover, Burton could have chosen to use less than deadly force in the situation. We cannot say the jury erred in finding the State met its burden of showing Burton did not act in self-defense. The jury could conclude that the State proved beyond a reasonable doubt that Burton was the aggressor and that he was not entitled to a claim of self-defense.

***Burton's right to present a defense****.*

Burton alleges the trial court deprived him of his right to present a defense when it excluded evidence of Cody's dangerous character based on the totality of the evidence and proffered to support Burton's plea of self-defense. He contends his own testimony and the testimony of Billy Bob established an overt act or hostile demonstration that laid the foundation for the admission of character evidence. Burton maintains that character evidence would have shown Burton and Billy Bob

26

knew Cody's reputation as "a fighter and a person who was - - who would not back down and was unpredictable."

> As a general matter, La.Code Evid. art. 404(A) provides evidence of a "person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion . . . ." However, an exception to the general inadmissibility of evidence concerning the victim's dangerous character arises under La.Code [Evid.] art. 404(A)(2) when there is evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense. Consequently, evidence of the victim's character is not appropriate, except when the defendant is claiming self-defense against an aggressor victim . . . .

*State v. Dressner*, 08-1366, p. 15 (La. 7/6/10), 45 So.3d 127, 138, *cert. denied*, 562 U.S. 1271, 131 S.Ct. 1605 (2011).

"Evidence of a person's character is generally inadmissible, unless the defendant in a homicide case claims self-defense and the issue is whether the deceased was the aggressor or what was the defendant's state of mind." *State v. Ledet*, 96-1521, pp. 5-6 (La.App. 3 Cir. 4/2/97), 692 So.2d 1309, 1312, *writ denied,* 98-362 (La. 6/5/98), 720 So.2d 678. "A homicide is justifiable . . . [w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20(A)(1).

"Before being entitled to present evidence of the victim's character, the defendant must present 'appreciable evidence' of the overt act." *State v. Couteau*, 10-1940, p. 3 (La.App. 1 Cir. 5/6/11) (unpublished opinion),[5] *writ denied*, 11-1204 (La. 3/9/12), 84 So.3d 544.

> The term "overt act," as used in prosecutions where the plea of self-defense is involved, means any act of the victim that manifests to the mind of a reasonable person a present intention on his part to kill or do great bodily harm. *State v. Loston,* 03–0977 (La.App. 1 Cir. 2/23/04), 874 So.2d 197, 205–06, *writ denied,* 04–0792 (La.9/24/04), 882 So.2d

---

[5]The Westlaw citation is 2011 WL 2616917.

1167. To meet the "overt act" requirement of Article 404A(2)(a), a defendant must introduce "appreciable evidence" in the record relevantly tending to establish the overt act. Once the defense has introduced such appreciable evidence, the district court cannot exercise its discretion to infringe on the fact-determining function of the jury by disbelieving this defense testimony and denying the accused a defense permitted him by law. A district court's determination that the defendant has not laid a sufficient evidentiary foundation upon which to introduce testimony concerning the victim's dangerous character will not be disturbed absent a finding of clear error. *State v. Felder,* 00–2887 (La.App. 1 Cir. 9/28/01), 809 So.2d 360, 367, *writ denied,* 01–3027 (La.10/25/02), 827 So.2d 1173.

Moreover, even where a proper foundation is laid, the admissibility of a victim's character trait depends on the purpose for which the evidence is offered. Once evidence of an overt act on the part of the victim has been presented, evidence of threats and of the victim's dangerous character is admissible for two distinct purposes: (1) to show the defendant's reasonable apprehension of danger which would justify the conduct; and (2) to help determine who was the aggressor in the conflict. Only evidence of general reputation and not specific acts, is admissible in order to show who the aggressor was in the conflict. Evidence of prior specific acts of the victim against a third party is inadmissible for this purpose. When evidence of a victim's dangerous character is offered to explain a defendant's reasonable apprehension of danger, such evidence may be introduced to show the accused's state of mind only if it is shown that the accused knew of the victim's reputation at the time of the offense.

*State v. Maurer*, 13-1643, pp. 4-5 (La.App. 1 Cir. 3/21/14) (unpublished opinion).[6]

The threshold question here is, as in *Maurer*, "whether defendant introduced 'appreciable evidence' into the record to establish an overt act by the victim . . . ." *Maurer* at p. 5. We have already explained that the evidence is more than sufficient for the jury to reasonably reject Burton's assertion that Cody was "coming at him" with a knife. The State contended evidence of "some turning around . . . some running back, feet prints in the sand, dirt kicked up, that sort of thing" failed to meet the burden to prove a hostile demonstration that would warrant introduction of character evidence of the victim. The State also argued Burton was the aggressor in

---

[6]The Westlaw citation is 2014 WL 1167511.

28

the situation because he grabbed the gun inside the trailer and exited the trailer to confront Cody. We agree.

Defendant made a proffer outside the presence of the jury. The trial court commented, "The Court had ruled because of the totality of the circumstances specifically in relation to any other corroborating testimony and independent testimony or evidence about - - I did not allow character evidence as to reputation . . . ." The State's counsel understood "the Court excluded the reputation evidence . . . because there had not been a hostile or overt act." The trial court explained:

> [T]he foundation wasn't laid and there was not enough - - now, as I said in the sidebar, there's been all these comments out there about specific allegations or malicious statements that I think go beyond just reputation and they go to specific acts. But I think [defense counsel] wants to proffer based upon my ruling some - - a statement, I guess, he's going to make of what his client's testimony would be as to the general reputation of the defendant and maybe even the victim - - of the victim as well as, maybe, Mr. Freeman's testimony.

The trial court found Burton had shown nothing to support the introduction of evidence of specific acts of the victim. It believed the only evidence of an overt act was the victim "[r]unning towards somebody who had a shotgun that was loaded." It also found the required foundation was that a reasonable person would believe he was "in threat of being killed or receiving great bodily harm." The trial court ruled that no foundation was laid particularly noting Burton was the major contributor of the DNA on the knife and that there was not enough of Cody's DNA on the knife to include him as a minor contributor.

In *State v. Loston*, 03-977 (La.App. 1 Cir. 2/23/04), 874 So.2d 197, *writ denied*, 04-792 (La. 9/24/04), 882 So.2d 1167, the victim and the defendant had a verbal dispute at a local establishment. After they left, the victim told his brother Gregory "he had a 'beef' with the defendant[,]" and he knew where to find him. *Id.* at 201. Later that night, the victim and Gregory rode their bicycles to a residence

where they thought they would find the defendant. The victim arrived first. By the time Gregory arrived, the victim had entered the residence and was exiting it, followed by the defendant and several other people. The victim "was hollering and using profanities." *Id.* at 202. As the group walked toward the road, they began to argue and fight. Gregory saw a woman in the group with a knife in her hand; other testimony indicated she then gave the knife to the defendant. Another witness said the defendant armed himself with a knife before going outside. After a fight broke out, Gregory saw the victim on top of the defendant, choking him. Gregory pulled the victim off the defendant, and they left. On the way home, the victim collapsed and died from a knife wound. Toxicology reports showed the victim had a blood alcohol level in excess of .2 and illegal controlled substances, including cocaine, in his system. The defendant admitted he had stabbed the victim, but he did not think the wound was bad enough to kill him. On cross-examination at trial, defense counsel tried to show the victim had a reputation for fighting, and the defendant had acted in self defense. Another witness testified the victim was drunk that night and was known for fighting. Gregory also admitted they had been drinking and testified the victim had been in fights in the past. A different witness, however, testified the victim was angry but not drunk or on drugs.

The first circuit found "no appreciable evidence to show that the victim initiated the physical confrontation." *Id.* at 206. Even though the victim had to be pulled off the defendant after the struggle began, the first circuit thought "the victim at that point might well have been reacting to the conduct of the defendant in attacking him with a knife." *Id.* Thus, the defendant failed to establish a foundation for evidence of the victim's reputation in the community and of specific incidences of his conduct.

Likewise, according to Burton's own testimony, he armed himself and went out onto the porch based solely on hearing noise in the yard. This was an illegal act for him as a convicted felon. Even though Cody may have been running toward Burton to fight him, the evidence did not show that Burton could have reasonably thought he was in danger of death or great bodily harm. Although he claimed he saw something in Cody's hand, and a knife was found near Cody's hand after the shooting, the only DNA on the knife handle belonged to Burton suggesting Burton placed the knife next to Cody's body. The evidence did not show the killing was necessary to protect Burton or that less drastic measures to defend himself would have been ineffective.

For these reasons, we affirm the convictions and sentences. We remand the matter to the trial court for the purpose of amending Burton's sentences to delete the statement regarding diminution of sentence as the trial court was not authorized to deny diminution of sentence.

**AFFIRMED IN PART AND REMANDED.**

**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**18-935**

**STATE OF LOUISIANA**

**VERSUS**

**RANDALL PAUL BURTON**

Conery, J., concurring in the result.

While I believe the proposed opinion correctly applies the standard required by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), I nevertheless write separately as I find that there is an abundance of evidence that the victim was the aggressor. Either a verdict of manslaughter or not guilty based on self-defense may have been more appropriate in this case. However, the jury had the authority to, and apparently did, reject the testimony of Defendant and the eyewitness, Billy Bob Freeman, indicating that the victim was the aggressor and called out and charged toward Defendant in a threatening manner. Likewise, though the trial judge could have allowed Defendant to introduce evidence of the victim's bad character and violent tendencies pursuant to La.Code Evid. art. 404(A)(2), his decision to disallow that evidence was within his discretion.

Accordingly, in light of the standard of review, I concur in the result.