## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-562

STATE OF LOUISIANA

VERSUS

CHARLES RAY DAVIS

**********

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 2017-903
HONORABLE WARREN DANIEL WILLETT, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**CONVICTION AFFIRMED;
SENTENCE AFFIRMED AS AMENDED.**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P.O. Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Charles Ray Davis**

**James Patrick Lemoine**
**District Attorney, Thirty-Fifth Judicial District Court**
**Renee W. Nugent**
**Assistant District Attorney**
**P.O. Box 309**
**Colfax, LA 71417-0309**
**(318) 627-3205**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Jeffrey M. Landry**
**Attorney General**
**P.O. Box 94005**
**Baton Rouge, LA 70804**
**(225) 326-6200**
**COUNSEL FOR OTHER APPELLEE:**
     **Attorney General**
     **State of Louisiana**

**GREMILLION, Judge.**

On November 22, 2017, Defendant, Charles Ray Davis, was charged by bill of information with the sexual battery of T.M.,[1] in violation of La.R.S. 14:43.1. Following multiple pre-trial conference dates, the State filed an amended bill of information on April 22, 2019, clarifying that the victim's age was less than thirteen and Defendant was over seventeen years of age. On April 25, 2019, Defendant was found guilty as charged, with the jury specifically finding Defendant was over the age of seventeen and the victim was under the age of thirteen. The conviction was a 10-2 verdict.

On May 23, 2019, the trial court sentenced Defendant to thirty-five years at hard labor with the first twenty-five years being served without benefit of probation, parole, or suspension of sentence. Defense counsel objected and stated that he would be filing a written Motion to Reconsider Sentence. On May 24, 2019, defense counsel filed said motion, alleging Defendant's "sentence is excessive in light of the facts and circumstances in the instant matter." The motion was denied on June 30, 2019, with the notation that "No facts [were] alleged to support granting a motion."

Defendant now appeals his conviction and sentence, alleging insufficient evidence to support his conviction, that the 10-2 jury verdict is unconstitutional, and the bill of information is defective for failure to allege "all essential facts." For the following reasons, Defendant's conviction is affirmed, and Defendant's sentence is affirmed as amended.

---

[1] Initials are used in this opinion in accordance with La.R.S. 46:1844(W) to protect the identity of the victim.

## FACTS

The State's first witness was Officer Michael Shaw, formerly of the Montgomery Police Department. Officer Shaw testified he was sent to Defendant's home, in Grant Parish, on October 31, 2017. He noted the initial complaint was in reference to "a man chasing another man around the yard with a hammer." Officer Shaw testified he made contact with J.M., who was holding a claw hammer, who complied with all commands and was placed in the back of Officer Shaw's vehicle. Officer Shaw testified that while Defendant just wanted J.M. off his property, J.M. indicated he had come to attack Defendant because Defendant had molested J.M.'s child. Officer Shaw testified he believed J.M. had walked over five miles to confront Defendant.

Officer Shaw testified that he, along with Montgomery Police Chief Kerral Sapp and Deputy Amy LaBorde, spoke to J.M. at the police station. Officer Shaw testified that Detective Ryan James of the Grant Parish Sheriff's Office helped him facilitate a child advocacy center interview for the victim due to the allegations against Defendant. Officer Shaw testified he observed a change in the demeanor of the victim during the interview once Defendant was mentioned. Officer Shaw stated T.M. was living at Defendant's home so that he could continue attending the school he wanted to attend, as his parents lived in a different parish and school district. Officer Shaw was unaware if T.M. had been to Defendant's home since the incident.

The State then called former Montgomery Police Chief Sapp, who testified he stepped down from his position due to disagreements with the mayor in January of 2019 and was currently operating his own trucking business. Chief Sapp testified he was called to Defendant's residence by Officer Shaw, who was the responding officer. Chief Sapp identified Defendant's written statement that he did not wish to

2

pursue charges against J.M. Chief Sapp indicated his last involvement with the case was witnessing Defendant give his voluntary statement that he did not wish to pursue charges against J.M.

The State's next witness was Detective Ryan James of the Grant Parish Sheriff's Office with twenty-five years of law enforcement experience. He testified that he has worked over forty cases involving sexual abuse against children and stated that once an allegation is made, he contacts the Child Advocacy Center and sets up an interview for the child while refraining from speaking to the child. Detective James described the set-up of the Advocacy Center, noting that the child is interviewed out of law enforcement's presence, although law enforcement can monitor the interview from another room. Detective James testified that he and Officer Shaw were present and observed the interview of the victim. When asked if he had ever been involved in a case where the child had lied about inappropriate contact, Detective James testified "Oh, I've had some that uh, yeah. It's uh, in my best words, it's obvious."

R.S., T.M.'s mother, testified she had previously lived in a bungalow behind Defendant's home on his property. She stated she had five children, ranging in age from ten (T.M.) to twenty (T.M.'s sister, Brandy) years. R.S. testified that she, T.M., and T.M.'s sister, Mary, lived together in the bungalow while T.M.'s brother, Dylan, lived with Defendant in Defendant's home. She stated she lived in the bungalow for eight or nine months before moving in with her mother, R.N. She testified her mother was friends with Defendant.

R.S. testified that she moved in with her mother near the end of the school year with T.M. and Mary, but that Defendant suggested T.M. could live with him to finish the school year without transferring. She noted T.M. stayed with Defendant

into the following school year, leaving only after telling her about the incident in question. R.S. said T.M. would have been zoned for school in Atlanta, Louisiana, but that he disliked the school because kids bullied him for living in Carterville. R.S. testified that T.M. would spend the school week at Defendant's home and would come home with her every weekend.

R.S. stated that T.M. reported the incident to her on Halloween night, while they were trick-or-treating. She testified that after they finished trick-or-treating, T.M. told her he did not want to go back to Defendant's and at that time told her about the incident with Defendant. R.S. stated she did not know of T.M. telling anyone about the incident prior to telling her. She testified T.M. told her "he was sleeping on the couch in the living room at Mr. Charles' house, and he woke up, and Mr. Charles had his hand in [T.M.'s] pants playing with his - - his private." She acknowledged that T.M. typically slept either on the couch or in his older brother's room. She clarified that she had told T.M. that his penis was "his private." T.M. indicated to her that he woke up and rolled over and Defendant just got up and walked away.

After getting her mother to drive them home, R.S. informed her boyfriend, T.M.'s father, J.M. She stated that J.M. became angry and walked to Montgomery to confront Defendant. R.S. testified T.M. once told her he wished he had never said anything because he wanted his dogs, which were at Defendant's home, back. She testified she gave a statement to Chief Sapp two days later, relating what T.M. had told her happened. Her written statement, admitted as State's Exhibit 4, was dated November 1, 2017. R.S. testified that T.M. has not been allowed to stay at Defendant's home overnight since the incident but acknowledged that T.M. had been to the home with her.

4

R.S. testified the first time she learned Defendant was a registered sex offender was after the incident with T.M., stating she was told by people from the Office of Child Services. She stated Dylan had lived with Defendant for three or four years during high school, but that she was not sure if he was still there. She also testified that she, T.M., and J.M. learned Defendant was a sex offender after the incident and she would not have left T.M. with Defendant if she had known.

The State then called Megan Blackburn Hanna, the forensic interviewer who conducted the November 2, 2017 interview with T.M. Hanna described her training and the interview process used with minors during a forensic interview. Hanna identified the anatomical drawing T.M. made during his interview, in which he circled the penis as the area where Defendant touched him. The court then played the video of T.M.'s interview with Hanna for the jury.

*T.M.'S NOVEMBER 2, 2017 INTERVIEW*

The interview begins with Hanna building a rapport with T.M., who stated he was nine years old. T.M. stated he was in fourth grade. Eventually, T.M. stated that Defendant touched his "wrong spot" while T.M. was sleeping. He stated this happened "[a] couple days ago." T.M. stated: "I was asleep and I felt something touching my wrong spot and I woke up and he yanked his hand from it and he went walk back to his room." T.M. also stated Defendant's hand was touching him underneath his clothes. T.M. testified that was the only time Defendant had touched him inappropriately that he was aware of. T.M. testified that he learned on the day of the interview that Defendant had done something similar. T.M. used an anatomical drawing to verify that his "wrong spot" was his penis. T.M. indicated no one had told him what to say during his interview.

5

The State then called T.M. T.M. testified that he was ten years old and in fifth grade. He stated he understood the difference between the truth and a lie. He testified that he wanted to live with Defendant until Defendant touched him on his "wrong spot" while he was sleeping on the couch. He testified Defendant touched him underneath his boxers. He testified that he felt Defendant's hand while he was asleep, woke up, and Defendant went back to Defendant's room without saying anything.

T.M. testified he told his mother, after trick-or-treating, that Defendant had touched him, and he wanted to go home with his mother because he did not want to be touched again. He testified he went home with his mother, who told his father what happened, and his father walked to Defendant's home. Although T.M. testified that no one had told him what to say during his interview or his testimony, he stated his grandmother, R.N., told him to lie at trial.

On cross-examination, T.M. testified that he never told R.N. that he was lying about Defendant touching him. He also testified that he never told his brother, Dylan, that he was lying but stated Dylan "would say it was a lie, because I've known my brother, and he lies a lot." T.M. also denied ever telling Dylan's friend, D.M., that T.M. was lying about Defendant. At that time, the State rested.

The defense's first witness was R.N., T.M.'s maternal grandmother. She testified she met Defendant as a result of Dylan living with him. R.N. testified that she was in her truck with T.M. playing a game about keeping secrets, and T.M. told her he was lying about Defendant touching him but would not tell the truth because he was afraid his father would be mad at him for lying. She also testified that after the incident with Defendant, T.M. threatened to call the police on her and say she was playing "with his peepee worm." She testified that she raised Dylan until he

6

was sixteen, that he is currently eighteen, but somehow, he lived with Defendant for about six years.

R.N. testified that she was informed Defendant was a convicted sex offender the day she met him, before Dylan went to live with him. She also claimed R.S. knew Defendant was a sex offender, although she did not know when R.S. found out. After stating she was a "protective grandmother," R.N. stated she felt Defendant, who she knew was a sex offender, would be a good person to teach Dylan the "things that a man needs to teach a child." She also stated she did not think Defendant was a bad person, despite being a registered sex offender, because he told her he did not do it.

The defense then called Dylan, T.M.'s older brother. He testified that T.M. told him multiple times that Defendant did touch him, but that T.M. also told him multiple times that he made up the whole story so he would not have to go to school the next day. Dylan testified he considered himself a protective older brother. He testified he moved in with Defendant when he was thirteen or fourteen years old. Dylan stated his uncle sexually abused him when he was younger.

Dylan stated Defendant "is like a father to [him]" and was the only person who tried to help him. He admitted he did not want to see Defendant in trouble. Dylan testified the whole family knew Defendant was a convicted sex offender when Dylan started living with him and that T.M. has since threatened to accuse Dylan of touching him. Dylan testified he believed T.M.'s father, J.M., was telling T.M. to lie so Defendant would go to jail.

The defense then called E.S., who described herself as T.M.'s step-grandmother. She testified that T.M. told her, both before and after he accused Defendant of touching him, that he accused Defendant because he wanted to go to

7

school in Atlanta and his parents wanted him to stay with Defendant. She stated she did not want to see anything bad happen to Defendant, testifying "He's a very loyal, giving person. He's bought us food when we needed it, he'd give his shirt off his back, man."

The defense then called Dylan's friend, D.M. D.M. testified that a couple days after T.M. accused Defendant of touching him, D.M. saw T.M. at the library. He testified that T.M. said he lied about Defendant touching him so he could go home with his mom. The defense then rested its case. The State offered no rebuttal witnesses.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by for errors patent on the face of the record. After reviewing the record, we find there is an error patent regarding the trial court's statement that Defendant's sentence is not subject to diminution of sentence.

After stating the number of years imposed for Defendant's sentence, the trial court informed Defendant that upon his release, he would be required to register as a sex offender for the remainder of his life and that he would be required to be electronically monitored in accordance with La.R.S. 14:43.1(C)(4). The trial court then stated:

> Mr. Davis, your sentence has not been enhanced pursuant to the provisions of the Habitual Offender Act, nor has it been enhanced because there was no evidence of any use of firearm. You are not entitled to diminution for good behavior.

The minutes of sentencing also state that Defendant is not entitled to diminution for good behavior.

Although La.Code Crim.P. art. 894.1(D) previously required the trial court to advise a defendant of whether his sentence was subject to diminution for good behavior, the article was amended in 2010 to delete such requirement. 2010 La. Acts No. 350, § 1; *see also State v. D.G.H.*, 07-524 (La.App. 3 Cir. 10/31/07), 969 So.2d 1254. Thus, at the time the trial court imposed the present sentence, La.Code Crim.P. art. 894.1(D) no longer required such an advisement. When La.Code Crim.P. art. 894.1(D) did require such an advisement, this court distinguished between an advisement and an actual denial of diminution of sentence, finding no corrective action was needed if the trial court merely advised a defendant that his sentence was not subject to diminution. *State v. James*, 09-606 (La.App. 3 Cir. 12/9/09), 26 So.3d 915.

Although we could find that the trial court's statement was merely an advisement, we will proceed as if it was an actual denial of diminution of sentence. The trial court was no longer required by La.Code Crim.P. art. 894.1(D) to advise Defendant of whether his sentence was subject to diminution of sentence. Thus, the trial court's statement regarding diminution of sentence could be regarded as an actual denial of diminution of sentence. *See State v. Burton*, 18-935 (La.App. 3 Cir. 6/5/19), 274 So.3d 122, where this court found a similar statement by the trial court was an actual denial of diminution of sentence rather than a mere advisement.

Accordingly, Defendant's sentence should be amended to delete such statement, as the trial court was not authorized to deny diminution of sentence. The supreme court has held that the provisions of La.R.S. 15:537(A), which prohibits diminution of sentence for certain sex offenders, and the provisions of La.R.S. 15:571.3, which sets forth the guidelines for diminution of sentence for all prisoners, do not form part of the sentence but are directives to the Department of Corrections

in computing an inmate's sentence. *State v. Prejean*, 08-1192 (La. 2/6/09), 999 So.2d 1135 (per curiam). *See also State v. Fallon*, 15-1116 (La.App. 3 Cir. 4/6/16), 189 So.3d 605. "This court and the supreme court have repeatedly stated that trial judges lack authority to deny good time eligibility." *State v. Toups*, 17-792, p. 1 (La.App. 3 Cir. 11/22/17) (unpublished opinion.)[2] Accordingly, Defendant's sentence is amended to delete the trial court's statement regarding diminution eligibility, and the trial court is instructed to make an entry in the minutes reflecting the amendment. *See State v. Drummer*, 17-790 (La.App. 3 Cir. 6/6/18), 245 So.3d 93, *writ denied*, 18-1139 (La. 2/11/19), 263 So.3d 413.

## SUFFICIENCY OF THE EVIDENCE

In his first assignment of error, Defendant contends "[t]he State failed to sufficiently prove that [Defendant] was guilty of sexual battery." Defendant's argument is based not upon the State's failure to prove elements of the crime, but solely on the credibility of the victim. Defendant's entire argument can be summed up by a single sentence:

> Although the alleged victim, T.M. testified that Charles touched his penis with Charles' hand, (R. at 308-10), members of T.M.'s own family—whom are not related to Charles—testified that T.M. is not only a known liar, but he often threatens to lie about this specific allegation with other people.

The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v.*

---

[2]This case is cited at 2017 WL 5627774.

10

*Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Under La.R.S. 14:43.1:

A. Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing, when any of the following occur:

. . . .

(2) The victim has not yet attained fifteen years of age and is at least three years younger than the offender.

As noted by Defendant, T.M. testified Defendant touched T.M.'s penis with Defendant's hand while T.M. was asleep. Additionally, T.M. was still under the age of thirteen during trial. Accordingly, the State presented evidence to satisfy all elements of the crime. The only question, then, is whether T.M. was credible. As noted in *Kennerson*, this court should not undermine the jury's credibility determinations during a sufficiency review. Beyond this court not undermining the credibility determinations of the jury, T.M.'s testimony at trial was virtually the same as the information relayed during his interview with Hanna. Finally, the jury was presented with T.M.'s testimony, they viewed his interview, and they were present for the testimony of the defense witnesses who all claimed T.M. was lying. The jury is free to believe some, all, or none of a witness's testimony, and, despite having the claims before them that T.M. was lying, the jury still returned a guilty

11

verdict. When viewing the evidence in the light most favorable to the prosecution, T.M.'s testimony was sufficient to prove the elements of the offense beyond a reasonable doubt. This assignment of error lacks merit.

Furthermore, to the extent the jury was also required to find T.M. was under the age of thirteen to support Defendant's sentence, there was sufficient testimony from T.M., his mother, and his other relatives to verify that T.M. was, in fact, still under the age of thirteen at trial.

## NON-UNANIMOUS JURY

Defendant's second assignment of error contends that his conviction is unconstitutional because he was found guilty by a non-unanimous jury. Defendant is aware that the Louisiana Supreme Court declared the non-unanimous jury verdict system constitutional in *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738, and that this court is bound by that ruling. However, the Louisiana Supreme Court is not the final arbiter of this issue. Defendant asserts that in recent years, the United States Supreme Court's decision in *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628 (1972), a plurality decision in which the Court determined that the United States Constitution did not mandate unanimous jury verdicts in state court felony criminal trials, has come into question. Defendant points out the Supreme Court's unanimous ruling in *Timbs v. Indiana*, ___ U.S. ___, 139 S.Ct. 682 (2019), finding the excessive fines clause of the Eighth Amendment was incorporated to the States. Therein, the Supreme Court pointed out the sole exception to the incorporation of the Federal Bill of Rights remained the unanimous jury verdict right of the Sixth Amendment. Less than one month later, the Supreme Court granted certiorari in *Ramos v. Louisiana*, ___ U.S. ___, 139 S.Ct. 1318 (2019). In that case, the Court

12

will determine whether the Sixth Amendment's guarantee of a unanimous jury verdict is incorporated to the States through the Fourteenth Amendment.

Defendant additionally points out that Judge Stephen Beasley of the Eleventh Judicial District Court declared Louisiana's non-unanimous jury verdict system unconstitutional in "*State v. Maxie*, 13-7252 (11th JDC 10/11/18)." Defendant asserts *Maxie* is pending before the Louisiana Supreme Court. Defendant states that the law regarding unanimous jury verdicts was changed in November 2018, and the new law applies to crimes committed on or after January 1, 2019.[3]

Defendant contends his due process rights were violated in this case "because the State was not held to its burden of proof to convince all 12 'reasonable' jurors of its case."

Defendant claims this issue is being raised because trial counsel objected to the non-unanimous verdict during sentencing. We note that at no point prior to sentencing was the issue raised. There was no motion to declare the non-unanimous verdict unconstitutional, there was no objection to the inclusion of a jury instruction that only ten jurors had to agree to reach a verdict, and there was no objection made when the verdict was announced and the jury was polled. Defendant, however, contends the issue was properly preserved for appellate review. We disagree, noting the fifth circuit recently held that a defendant who failed to object to a non-unanimous jury instruction at the time it was rendered and who failed to challenge the constitutionality of either La.Const. art. I, § 17 or La.Code Crim.P. art. 782 could not raise the issue on appeal for failure to raise a contemporaneous objection under

_____

[3]Defendant's trial was held in April 2019, and the unanimous jury issue was approved by voters on November 6, 2018. *See* La.Const. art. I, § 17. However, the crime was committed in October 2017.

13

La.Code Crim.P. art. 841. *See State v. Brown*, 15-96 (La.App. 5 Cir. 9/15/15), 173 So.3d 1262, *writ denied*, 15-1872 (La. 10/10/16), 207 So.3d 403. The *Brown* court nonetheless addressed the validity of the non-unanimous jury verdict, and we will do the same.

Defendant further contends the violation at issue is so fundamental to his due process rights that it is an error patent. Defendant states, "No argument or further factual development was necessary at the trial level for this Court to see the constitutional violation and rule on it. The issue is properly before the Court and can be ruled upon. The conviction should be vacated and remanded for a new trial."

The State correctly notes that Defendant's reliance on *Maxie* is in error for two reasons: a district court ruling is neither binding on this court nor technically precedent, and the *Maxie* ruling was never actually reviewed by a higher court because the defendant pled guilty before a review was ever completed. In *State v. Hodge*, 19-568, 19-569, p.4 (La. 11/19/19), ___ So.3d ___, the supreme court recently found the same trial court which issued the *Maxie* ruling could not rely on said ruling as a basis for declaring La.Const. art. I, § 17 and La.Code Crim.P. art. 782 unconstitutional because *Maxie* was "an earlier, nonbinding district court ruling."

At the time the offense was committed, La.Const. art. I, § 17(A) provided, in part, "A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict." *See also* La.Code Crim.P. art. 782. Defendant was charged with sexual battery, which his punishable by imprisonment at hard labor. La.R.S. 14:43.1. Thus, Defendant was required to be tried by a jury of twelve, ten of whom had to concur to render a verdict. Defendant was tried by a jury of twelve, and ten of those jurors

concurred in the verdict. Thus, there is no error patent regarding the jury's verdict, and this assignment of error lacks merit.

## BILL OF INFORMATION

In his final assignment of error, Defendant contends the bill of information was defective "because it fails to allege 'all essential facts.'" Defendant's entire argument is that because he was sentenced under La.R.S. 14:43.1(C)(2), the bill of information was insufficient because it did not specify that the jury had to find T.M. was under the age of thirteen. Louisiana Revised Statutes 14:43.1(C)(2) increases the sentencing range for sexual battery from not more than ten years without benefits to "imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence." This enhancement is based upon the victim being under the age of thirteen and the defendant being over the age of seventeen. Defendant contends the bill of information failed to include language which would alert him that he would be sentenced under the enhanced sentencing statute.

Defendant's argument is based upon the factually incorrect claim that "[t]here was no amendment to the bill of information before or during trial to correct this error." On April 22, 2019, prior to trial, the State filed an amended bill of information, in open court and without objection, which indicated the victim was under the age of thirteen and Defendant was seventeen years of age or older. Furthermore, the jury was presented with a special verdict form wherein the jury indicated it found the victim was under the age of thirteen and Defendant was seventeen years of age or older. There was no error patent regarding the bill of information, and this assignment of error lacks merit.

15

## DECREE

Defendant's conviction for sexual battery in violation of La.R.S. 14:43.1 is affirmed. Defendant's sentence is amended to delete the trial court's denial of diminution of sentence, and the trial court is instructed to make an entry in the minutes reflecting this amendment. Defendant's sentence is affirmed as amended.

**CONVICTION AFFIRMED;**
**SENTENCE AFFIRMED AS AMENDED.**